IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | |
|---|---|
| In Re: § | |
| § | Case No. 09-(20644 |
| EDGE PETROLEUM CORP., et al., § | Jointly Administered |
| § | Chapter 11 |
| Debtors. § | |

## AFFIDAVIT OF GARY PITTMAN

I, Gary Pittman being duly sworn, declare the following under penalty of perjury:

I am an Executive Vice President and the Chief Financial Officer of Edge Petroleum Corporation ("Edge"). I have held this position since January 26, 2009. I have personal knowledge of the facts set forth herein.

**A.     Background**

> **(i)     *The Debtors' Businesses***

1.     On the date hereunder (the "Petition Date"), Edge, as well as various Edge subsidiaries, filed petitions pursuant to chapter 11 of the title 11 of the United States Code (the "Bankruptcy Code") with this Court. The Debtors continue to operate their businesses pursuant to Bankruptcy Code sections 1107(a) and 1108.

2.     The Debtors are independent energy companies engaged in the exploration, development, acquisition and production of natural gas, natural gas liquids and crude oil. The Debtors' operations are focused onshore in the United States, primarily in South and Southeast Texas, Southeast New Mexico, Mississippi, Arkansas and Louisiana. As of December 31, 2008, 83% of the Debtors' proved reserves were in Texas, 6% were in Mississippi, 6% were in New Mexico and 5% were in south Louisiana, Michigan, Alabama and Arkansas, collectively.

3.      As of June 30, 2009, the Debtors reported total assets of approximately $264 million on their unaudited balance sheets, of which $43.2 million were current assets.  The remaining $220.8 million in reported assets related primarily to property costs.  The Debtors reported a consolidated net loss of approximately $9.4 million for the three months ending June 30, 2009 and a consolidated net loss of approximately $86.3 million for the six months ending June 30, 2009.

### (ii)      *The Debtors' Texas Operations*

4.      As of December 31, 2008, the Debtors own interests in 110,297 gross (47,264 net) acres spread across numerous oilfields in south and southeastern Texas.  The Debtors' Texas operations are focused predominantly in the Vicksburg, Queen City and Deep Frio producing trends.  For the year ended December 31, 2008, the Debtors' Texas operations accounted for approximately 86% of the Debtors' total production.

### (iii)      *The Debtors' Mississippi Operations*

5.      As of December 31, 2008, the Debtors own interests in 19,822 gross (10,848 net) acres in the Mississippi Interior Salt Basin in south central Mississippi and 26,273 gross (21,448 net) undeveloped acres in the Floyd Shale play.  The Debtors acquired reserves and production in the Mississippi Interior Salt Basin as part of the Debtors' 2003 merger with Miller Exploration Company ("Miller").  Primary producing horizons in the Mississippi Interior Salt Basin around the Miller properties include the Hosston, Sligo, Rodessa and James Lime sections.  For the year ended December 31, 2008, the Debtors' Mississippi operations accounted for approximately 4% of the Debtors' total production.

### (iv)      *The Debtors' New Mexico Operations*

6.      As of December 31, 2008, the Debtors own interests in 99,837 gross (21,001 net) acres in southeastern New Mexico that the Debtors earned through a drilling obligation fulfilled

during 2004 and 2005 and through subsequent purchases. Objectives in this area include shallow oil in the Yeso, San Andres, Queen and Grayburg formations and natural gas in the Atoka and Morrow formations. Additional objectives exist in the Strawn, Cisco, Wolfcamp and Devonian formations. For the year ended December 31, 2008, the Debtors' New Mexico operations accounted for approximately 8% of the Debtors' total production.

(v)     *The Debtors' Louisiana, Michigan, and Arkansas Operations*

7.     As of December 31, 2008, the Debtors own interests in 1,583 gross (463 net) acres in south Louisiana primarily located in the Acadia and Lafayette Parishes and 5,661 gross (4,801 net) acres in the Fayetteville Shale play in south central Arkansas. The Debtors also acquired acreage and one producing well in south central Michigan as part of the 2003 merger with Miller. Production from wells in each of these areas represented less than 1% of the Debtors' total production in 2008.

(vi)     *Derivative Instruments and Price Risk Management Activities*

8.     The profitability of the Debtors' operations in any particular accounting period is directly related to the realized prices of oil and natural gas sold, the type and volume of the oil and natural gas produced, and the results of development, exploitation, acquisition, exploration and hedging activities. The realized price of oil is predominately influenced by global supply and demand, while natural gas prices fluctuate due to regional market conditions and other factors. The aggregate amount of oil and natural gas produced may fluctuate based on the success and timing of development and exploitation of oil and natural gas reserves pursuant to current reservoir management and the Debtors' ability to deliver production to a purchaser.

9.     Due to the volatility of oil and natural gas prices, the Debtors periodically enter into price risk management transactions, including natural gas and crude oil swaps and collars, for a portion of their expected production. These swaps and collars, which have historically been

placed with major financial institutions, are designed to mitigate our exposure to commodity price movement of anticipated sales of future production. The Debtors entered into most of these derivative transactions as a means to achieve a more predictable cash flow and reduce exposure from commodity price fluctuations.

### (vii)   *The Debtors' Pre-petition Credit Facility*

10.   In January 2007, the Debtors entered into a credit agreement (the "Credit Facility") with Union Bank of California as agent and issuing lender (the "Agent") and other lenders party thereto (collectively and together with the Agent, the "Pre-petition Lenders"). The Credit Facility provided for a $750 million revolving credit facility, with an initial borrowing base of $320 million. The Credit Facility is secured by liens and security interests in substantially all of the Debtors' oil and gas properties and contains covenants, restrictions and events of default that are customary for similar facilities. The Credit Facility originally matured on January 30, 2011, but has since been amended to provide for a September 30, 2009 maturity date. As of September 30, 2009, $226.5 million in total borrowings were outstanding under the Credit Facility.

11.   The borrowing base under the Credit Facility was subsequently reduced to $300 million in December 2007 and to $250 million in May 2008. The Pre-petition Lenders agreed to defer conducting a borrowing base redetermination, originally scheduled for June 30, 2008, until October 31, 2008. On November 5, 2008 the Pre-petition Lenders agreed to defer conducting the borrowing base redetermination from October 31, 2008 until November 15, 2008. As consideration for this deferral, the Pre-petition Lenders placed a restriction on the Debtors' borrowing base, reducing it from $250 million to $240 million and effectively reducing the Debtors' available borrowing capacity under the Credit Facility from $11 million to $1 million, at which time $239 million in total borrowings were outstanding under the Credit Facility.

12.     On January 8, 2009, the Pre-petition Lenders notified the Debtors that the borrowing base was being reduced from $240 million to $125 million, resulting in the aggregate principal amount of advances outstanding under the Credit Facility exceeding the Debtors' borrowing base by approximately $114 million.  As a result, and pursuant to the terms of the Credit Facility, the Debtors were required to take one or more of certain actions to timely eliminate such deficiency, including prepaying the borrowing base deficiency (with prepayments to be made in six equal monthly installments) or pledging additional oil and natural gas properties as collateral.  The Debtors elected to prepay the borrowing base deficiency in six equal monthly installments, with the first $19 million installment being due on February 9, 2009.

13.     Both prior to and after this borrowing base redetermination, the Debtors evaluated strategic alternatives, including a capital restructuring.  To assist in analyzing various financial and strategic alternatives, the Debtors retained the investment banking firm Parkman Whaling LLC ("Parkman Whaling") and the law firm Akin Gump Strauss Hauer & Feld LLP ("Akin Gump") to represent the Debtors generally as their primary outside counsel.

14.     In a consent and agreement dated February 9, 2009, the Debtors and Pre-petition Lenders agreed to defer the payment of the first $19 million installment to reduce the borrowing base deficiency until March 10, 2009, and to extend the due date of each subsequent installment by one month.  The last of the six installment payments would be due and payable on August 10, 2009.  In addition, the Debtors agreed to prepay $5 million of the outstanding advances under the Credit Facility in two equal installments.  The first $2.5 million was paid on February 9, 2009 and the second $2.5 million prepayment was paid on February 23, 2009.  Each of the prepayments was to be applied on a pro rata basis to reduce the six $19 million deficiency payments.  In a second consent and agreement dated March 10, 2009, the Debtors and the Pre-

petition Lenders agreed that the first $19 million installment to reduce the borrowing base deficiency would be due and payable on March 17, 2009.

15.     On March 16, 2009, the Debtors and the Pre-petition Lenders entered into that certain Consent and Amendment No. 4 to the Credit Facility, whereby the Debtors agreed (i) to repay $25 million of the outstanding advances under the Credit Facility, together with any accrued interest, on or before May 31, 2009 and to repay all remaining outstanding advances and accrued interest on or before June 30, 2009; and (ii) that it would be an event of default if the Debtors failed to execute and deliver, on or before May 15, 2009, a transaction that would result in proceeds sufficient to repay the Debtors' obligations under the Credit Facility on or before June 30, 2009.

16.     On May 15, 2009, the Debtors and the Pre-petition Lenders entered into that certain Amendment No. 5 to the Credit Facility, which provided for the elimination of the provision in the Credit Facility that provided for an event of default if the Debtors failed to execute and deliver, on or before May 15, 2009, a transaction that would result in a sufficient amount to repay all of the Debtors' obligation under the Credit Facility on or before June 30, 2009.

17.     On May 29, 2009, the Debtors and the Pre-petition Lenders agreed in that certain Amendment No. 6 to the Credit Facility to eliminate the May 31, 2009 payment obligation, with such payments together with all remaining principal and interest payments to be due on or before June 30, 2009.

18.     On June 30, 2009, the Debtors and the Pre-petition Lenders agreed in that certain Amendment No. 7 to the Credit Facility to eliminate the June 30, 2009 payment obligation and requiring: (i) a payment of $1,142,753.42 to be due on or before June 30, 2009; (ii) a payment of

$7.5 million to be due on or before July 10, 2009; and (iii) all remaining principal and interest payments to be due on or before July 31, 2009.

19.    On July 31, 2009, the Debtors and the Pre-petition Lenders agreed in that certain Amendment No. 8 to the Credit Facility to eliminate the July 31, 2009 payment obligation, with such payments together with all remaining principal and interest payments to be due on or before August 31, 2009.

20.    On August 31, 2009, the Debtors and the Pre-petition Lenders agreed in that certain Amendment No. 9 to the Credit Facility to change the date on which all remaining principal and interest payments would be due from August 31, 2009 to on or before September 30, 2009.

(viii)  ***The Debtors' Proposed Plan of Reorganization and Related Agreements***

21.    Faced with declining revenues and the need to address the near-term maturity of the Credit Facility and following an extensive pre-petition marketing effort, prior to the Petition Date, the Debtors engaged in discussions with the Pre-petition Lenders regarding a potential restructuring plan for the Debtors. After several weeks of active and arm's-length negotiations, the Debtors reached an agreement with a majority of the Pre-petition Lenders regarding the terms of a pre-arranged restructuring plan (the "Plan"), as evidenced by a certain Plan Support Agreement (the "Plan Support Agreement"). The Debtors' Plan and the Plan Support Agreement were filed by the Debtors on the Petition Date. The Debtors believe that the agreements reached with the Pre-petition Lenders and evidenced by the Plan and the Plan Support Agreement will significantly facilitate these chapter 11 cases and the Debtors' objective of preserving and enhancing value for the benefit of their stakeholders.

(ix)     *The Proposed Sale of Edge's Subsidiaries to PGP*

22.     On the Petition Date, the Debtors also sought Court approval of their proposed bidding procedures to effect the sale of substantially all of their assets to the third party who submits the highest and best offer to purchase the Equity Interests (the "Sale Motion"). In connection with the Sale Motion, on September 30, 2009, the Debtors and PGP Gas Supply Pool No. 3 LLC (the "Buyer") entered into a purchase and sale agreement (the "Purchase Agreement") whereby the Buyer would purchase and acquire the stock (the "Equity Interests") of Edge's subsidiaries[1] for a base purchase price of $191 million, subject to adjustment as provided in the Purchase Agreement and also subject to higher and better offers.

(x)     *The Plan Support Agreement*

23.     After several weeks of active and arm's-length negotiations, the Debtors, in consultation with their advisors, have reached pre-petition agreements with the Debtors' secured lenders on a pre-arranged restructuring plan. The terms of the Debtors' pre-arranged restructuring plan are evidenced by that certain Plan Support Agreement (the "Plan Support Agreement"). A true and correct copy of the Plan Support Agreement (without exhibits) is attached hereto as **Exhibit A**. The Plan Support Agreement, together with the corresponding term sheet, provides a strong platform for a consensual plan of reorganization to be filed by the Debtors in these chapter 11 cases and should significantly facilitate these proceedings and the Debtors' objective of preserving and enhancing value for the benefit of their stakeholders.

---

[1] The Purchase Agreement contemplates the sale of the stock of the following entities: Edge Petroleum Exploration Company, Edge Petroleum Operating Company, Edge Petroleum Production Company, Miller Exploration Company, and Miller Oil Corporation.

**B.    Debtors' Motion Pursuant to Bankruptcy Rule 1015 Requesting Joint Administration of Chapter 11 Cases**

24.    The Debtors seek joint administration of their chapter 11 cases for procedural purposes only pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 1015 of the Local Rules for the United States Bankruptcy Court for the Southern District of Texas (the "Local Rules").

25.    On the Petition Date, the Debtors commenced the chapter 11 cases referenced above by filing the appropriate petitions with this Court. Given the provisions of the Bankruptcy Code and the Bankruptcy Rules, as well as the Debtors' affiliation, joint administration of these cases is warranted. Joint administration will avoid the preparation, replication, service, and filing, as applicable, of duplicative notices, applications, and orders in each of the Debtors' cases, thereby saving the Debtors' estates considerable expense and resources. The relief requested will not adversely affect creditors' rights as this Motion requests only administrative, and not substantive, consolidation of the Debtors' estates. Moreover, each creditor may still file its claim against a particular estate. In fact, the reduced costs that will result from the joint administration of these cases will enhance the rights of all creditors. The relief requested will also relieve the Court of the burden of entering duplicative orders and maintaining duplicative files and dockets, and, similarly, simplify supervision of the administrative aspects of these chapter 11 cases by the United States Trustee for the Southern District of Texas (the "U.S. Trustee").

26.    The Debtors further seek permission to file consolidated schedules of assets and liabilities and statements of financial affairs, and as applicable, lists of equity security holders (collectively, the "Schedules"). Filing consolidated Schedules will not only eliminate duplicative information contained in the Schedules, but will also further judicial economy.

Further, distributions under the plan of reorganization contemplated by the Debtors are structured in such a way that creditors will receive little to no benefit from the filing of separate Schedules.

27.     Finally, the Debtors seek authority to file the monthly operating reports required by the U.S. Trustee on a consolidated basis.  Consolidated monthly operating reports will further administrative economy and efficiency without prejudice to any party in interest.

**C.     Motion of Debtors for Order Under 28 U.S.C. § 156(c) and Bankruptcy Rule 2002(f) Approving Agreement With Kurtzman Carson Consultants LLC and Appointing Kurtzman Carson Consultants LLC as Claims, Noticing, Soliciting and Balloting Agent**

28.     The Debtors have thousands of creditors, equity security holders, potential creditors, and parties in interest to whom the Debtors and/or the office of the Clerk of the Bankruptcy Court for the Southern District of Texas (the "Clerk's Office") must serve various notices, pleadings, and other documents filed in these cases.  Such parties in interest will produce thousands of proofs of claim that must be docketed and administered.  The size of the Debtors' creditor body makes it impracticable for the Debtors to, without assistance, undertake the task of sending notices and dealing with claims.  Moreover, upon information and belief, the Clerk's Office is not equipped to efficiently and effectively serve notice on the large number of creditors and parties in interest and docket claims during the Debtors' chapter 11 cases.  In light of the number of anticipated claimants and parties in interest, the Debtors respectfully submit that appointing Kurtzman Carson Consultants LLC ("KCC"), an independent third party, to act as the Debtors' claims, noticing, soliciting and balloting agent (the "Claims Agent") will provide the most effective and efficient means of, and relieve the Debtors and/or the Clerk's Office of the administrative burden of, noticing, administering claims, and soliciting and balloting votes.

29.    KCC is a data processing firm that specializes in chapter 11 administration, consulting, and analysis, including noticing, claims processing, voting, and other administrative tasks in chapter 11 cases. The Debtors wish to engage KCC to, among other things, establish and maintain the creditor matrix, send out certain designated notices, receive and docket claims, and maintain claims files and a claims and voting register. The Debtors believe that such assistance will expedite service of notices, streamline the claims administration process, and permit the Debtors to focus on their reorganization efforts.

30.    The Debtors believe that KCC is well qualified to provide such services based on its expertise in the industry. As set forth in the Affidavit of Michael J. Frishberg In Support of Motion of Debtors for Order Under 28 U.S.C. § 156(c) and Bankruptcy Rule 2002(f) Approving Agreement With Kurtzman Carson Consultants LLC and Appointing Kurtzman Carson Consultants LLC as Claims, Noticing, Soliciting and Balloting Agent ("Frishberg Affidavit"), KCC has assisted and advised numerous chapter 11 debtors in connection with noticing, claims administration, and reconciliation, and the administration of plan votes. KCC has provided identical or substantially similar services in other chapter 11 cases, including: *In re Idearc Inc., et al.*, Case No. 09-31828 (Bankr. N.D. Tex. 2009); *In re Pilgrim's Pride Corporation, et al.*, Case No. 08-45664 (N.D. Tex 2008); *In re Home Interiors & Gifts, Inc.*, Case No. 08-31961 (Bankr. N.D. Tex. 2008); *In re Renaissance Hospital Grand Prairie, Inc., et al.*, Case No. 08-43775 (Bankr. N.D. Tex. 2008); *In re Gottschalks Inc.*, Case No. 09-10157 (Bankr. D. Del. 2009); *In re Aleris International Inc., et al.*, Case No. 09-10478 (Bankr. D. Del. 2009); *In re HPG International, Inc., et al.*, Case No. 09-10231 (Bankr. D. Del. 2009); *In re Washington Mutual, Inc., et al.*, Case No. 08-12229 (Bankr. D. Del. 2008); *In re Motor Coach Industries International, Inc., et al.*, Case NO. 08-12136 (Bankr. D. Del. 2008); *In re Boscov's, Inc., et al.*,

Case No. 08-11637 (Bankr. D. Del. 2008); *In re Mervyn's Holdings, LLC, et al.*, Case No. 08-11586 (Bankr. D. Del. 2008); *In re Linens Holding Co., et al.*, Case No. 08-10832(CSS) (Bankr. D. Del. 2008); *In re Tronox, Inc.*, Case No. 09-10156 (Bankr. S.D.N.Y. Jan. 13, 2009); *In re Paper Int'l, Inc.*, Case No. 08-13917 (Bankr. S.D.N.Y. Oct. 10, 2008); and *In re Wellman, Inc.*, Case No. 08-10595 (Bankr. S.D.N.Y. March 12, 2008).

31.     Although the Debtors do not propose to retain KCC under Bankruptcy Code section 327, to the best of the Debtors' knowledge, and as disclosed in the Frishberg Affidavit, the members and employees of KCC do not hold or represent an interest materially adverse to the Debtors' estates with respect to any matter upon which KCC is to be engaged.

32.     To the best of the Debtors' knowledge, KCC is a "disinterested person" as that term is defined in Bankruptcy Code section 101(14), as modified by Bankruptcy Code section 1107(b), in that its members and employees:

      (a)     are not creditors, equity security holders or insiders of the Debtors; and

      (b)     are not, and were not, within 2 years before the date of the filing of the petition, directors, officers, or employees of the Debtors.

33.     As set forth in the Frishberg Affidavit:

      (a)     KCC, in its capacity as Claims Agent, is not and will not be employed by the U.S. government or any federal agency (collectively, the "Government") and will not seek any compensation from the Government;

      (b)     By accepting employment in these chapter cases, KCC waives any right to receive compensation from the Government;

      (c)     In its capacity as Claims Agent, KCC is not an agent of the Government and is not acting on behalf of the Government;

      (d)     KCC will not intentionally misrepresent any material fact to the public; and

      (e)     KCC will not employ any past or present employees of the Debtors in connection with its work as the Claims Agent in these chapter 11 cases.

34.     KCC may have relationships with other professionals to be retained by the Debtors. Drake D. Foster, General Counsel of KCC, and Patrick J. Ivie, Senior Consultant at KCC, were employed previously as counsel by Akin Gump Strauss Hauer & Feld LLP ("Akin Gump"), proposed counsel to the Debtors, prior to joining KCC. Mr. Foster's and Mr. Ivie's work at Akin Gump was unrelated to the Debtors and their chapter 11 cases.

35.     The Debtors propose to retain KCC on the terms and conditions set forth in the Agreement. Under the Agreement, KCC will perform the following services, as the Claims Agent, at the request of the Debtors or the Clerk's Office:

> (a)     Establish and maintain the creditor matrix,
>
> (b)     Prepare and serve required notices in these chapter 11 cases, including, but not limited to:
>
>> (i)     A notice of commencement of these chapter 11 cases and the initial meeting of creditors under Bankruptcy Code section 341(a);
>>
>> (ii)    A notice of the claims bar date;
>>
>> (iii)   Notices of objections to claims;
>>
>> (iv)    Notices of any hearings on a disclosure statement and confirmation of a plan of reorganization;
>>
>> (v)     Notice of hearing on motions filed by United States Trustee;
>>
>> (vi)    Notice of transfer of claim;
>>
>> (vii)   Such other miscellaneous notices as the Debtors or the Court may deem necessary or appropriate for an orderly administration of these chapter 11 cases; and
>>
>> (viii)  Assist in the publication of required notices, as necessary;
>
> (c)     Within five (5) business days after the service of a particular notice, prepare for filing with the Clerk's Office an affidavit of service that includes (i) a copy of the notice served, (ii) an alphabetical list of persons on whom the notice was served, along with their addresses, email addresses or fax numbers, and (iii) the date and manner of service.

(d)    Assist the Debtors in preparing and filing their Schedules of Assets and Liabilities, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs.

(e)    Provide the filing location for all proofs of claim and proofs of interest, at its office located at: 2335 Alaska Avenue, El Segundo, California 90245; and receive and maintain copies of all proofs of claim and proofs of interest filed in these cases;

(f)    Maintain official claims registers in these cases by docketing all proofs of claim and proofs of interest in a claims database that includes the following information for each such claim or interest asserted:

    (i)    The name and address of the claimant or interest holder and any agent thereof if the proof of claim or proof of interest was filed by an agent;

    (ii)    The date the proof of claim or proof of interest was received by KCC and/or the Court;

    (iii)    The claim number assigned to the proof of claim or proof of interest;

    (iv)    The asserted amount and classification of the claim; and

(g)    KCC will maintain a separate claims register for each debtor in these jointly administered cases. KCC will record all transfers of claims and make changes to the creditor matrix after the objection period has expired. KCC will also record any order entered by the Court which may affect the claim by making a notation on the claims register and monitor the Court's docket for any claims related pleading filed and make necessary notations on the claims register.

(h)    Implement necessary security measures to ensure the completeness and integrity of the claims registers;

(i)    Transmit to the Clerk's Office a copy of the updated claims registers, in alphabetical and numerical order as requested by the Clerk's Office;

(j)    File a quarterly updated claims register or certificate of No Claims Activity if there has been no claims activity in that quarter;

(k)    Maintain a current mailing list for all entities that have filed proofs of claim or proofs of interest and make such list available to the Clerk's Office or any party in interest upon request;

(l)     Provide access to the public for examination of copies of the proofs of claim or proofs of interest filed in these cases without charge during regular business hours;

(m)     Record all transfers of claims pursuant to Bankruptcy Rule 3001(e) and give notice of such transfers as required by Bankruptcy Rule 3001(e);

(n)     Assist the Debtors in the reconciliation and resolution of claims;

(o)     Comply with applicable federal, state, municipal and local statutes, ordinances, rules, regulations, orders, and other requirements;

(p)     Assign temporary employees to process claims, as necessary;

(q)     Promptly comply with such further conditions and requirements as the Clerk's Office or the Court may at any time prescribe;

(r)     Provide balloting, and solicitation services, including preparing ballots, producing personalized ballots, and tabulating creditor ballots on a daily basis; and

(s)     Provide such other claims processing, noticing, soliciting, balloting, and administrative services as may be requested from time to time by the Debtors.

36.     The fees to be charged by KCC are set forth on the pricing sheet referenced in to the Agreement. The Debtors respectfully submit that the rates to be charged by KCC for its services as Claims Agent are competitive and comparable to the rates charged by its competitors for similar services.

37.     The Debtors request authority to compensate and reimburse KCC in accordance with the payment terms, procedures, and conditions set forth in the Agreement for services rendered and expenses incurred in connection with the Debtors' chapter 11 cases.

38.     The Debtors request that the fees and expenses of KCC incurred in performing the services described above be treated as an administrative expense of the Debtors' chapter 11

estates and be paid by the Debtors in the ordinary course of business.[2]  If any dispute arises between KCC and the Debtors with respect to fees and expenses, such dispute shall be presented to this Court for resolution.

39.    As part of the overall compensation payable to KCC under the terms of the Agreement, the Debtors have agreed to certain limitations of liability and indemnification as described in the Agreement.

**D.    Debtors' Motion Pursuant to Bankruptcy Code Sections 105(a), 363(b), and 541 for Authorization to Pay Certain Pre-petition Taxes and Licensing Fees**

40.    The Debtors request, pursuant to Bankruptcy Code sections 105(a), 363(b), and 541, authority, but not direction, to pay certain pre-petition tax obligations (the "Taxes") and licensing fees (the "Licensing Fees") to various state and local authorities (collectively, the "Taxing Authorities"), including those obligations subsequently determined upon audit to be owed for periods prior to the Petition Date and those amounts paid by check prior to the Petition Date which have not yet cleared. A list of the Taxing Authorities to which the Taxes are owed is annexed hereto as **Exhibit B**.[3]  A list of the Taxing Authorities to which the Licensing Fees are owed is annexed hereto as **Exhibit C**.    Although the Debtors believe the list of Taxing Authorities set forth on Exhibit B and Exhibit C is substantially complete, the relief requested herein is to be applicable with respect to all Taxing Authorities and is not limited to those Taxing Authorities listed on Exhibit B and Exhibit C.

---

[2] As an administrative agent and an adjunct to this Court, the Debtors do not believe that KCC is a "professional" whose retention is subject to approval under Bankruptcy Code section 327 or whose compensation is subject to approval of the Court under Bankruptcy Code sections 330 and 331.

[3] The Debtors also remit taxes to taxing authorities in respect of federal, state, and local income taxes, social security, and Medicare that the Debtors withhold from employees' wages. Remittance of these taxes to the applicable Taxing Authorities is addressed in a separate motion filed contemporaneously herewith pertaining to the Debtors' employee wage and benefits programs.

41.     As part of their cash management system, the Debtors maintain bank accounts at various banks and other financial institutions (collectively, the "Banks"). The Debtors draw upon funds in their accounts at the Banks to satisfy obligations arising from the Taxes and the Licensing Fees. The Debtors request that this Court authorize the Banks to receive, honor, process, and pay any and all checks drawn, or electronic fund transfers requested or to be requested, to the extent that such checks or electronic fund transfers relate to any of the Taxes or the Licensing Fees.

42.     In the normal course of business, the Debtors collect and/or pay the following:

- ad valorem taxes;
- severance taxes;
- personal property taxes;
- franchise taxes;
- income taxes;
- saltwater disposal well licensing fees;
- annual certification fees;
- emergency plugging fund fees;
- annual business license fees;
- seismic shoot licensing fees; and
- various other state and federal licensing fees related to the Debtors' oil and gas operations.

43.     As of September 30, 2009, the Debtors estimate that approximately $2,904,000 relating to the pre-petition period will become due and owing to the Taxing Authorities in the ordinary course of business. The Debtors do not believe that any Licensing Fees are owed as of the Petition Date. However, out of an abundance of caution, the Debtors seek to pay any

outstanding Licensing Fees that may exist.  Moreover, prior to the Petition Date, the Debtors

may have sent checks to certain Taxing Authorities that may not have cleared as of the Petition

Date.

44.     Payment of the Taxes and Licensing Fees is critical to the Debtors' continued and

uninterrupted operations.  Non-payment of these obligations may cause Taxing Authorities to

take precipitous action, including, but not limited to, filing liens, preventing the Debtors from

conducting business in the applicable jurisdictions, or seeking to lift the automatic stay, any of

which would disrupt the Debtors' day-to-day operations and could potentially impose significant

costs on the Debtors' estates.

**E.      Motion of the Debtors for Entry of Interim and Final Orders Determining Adequate
Assurance of Payment For Future Utility Services**

45.     In the ordinary course of their businesses, the Debtors obtain gas, water, sewer,

electric, and other similar utility services from approximately 90 utility providers (the "Utility

Providers").  A list of the Utility Providers who rendered services to the Debtors as of the

Petition Date (the "Utility Service List") is attached hereto as **Exhibit D**.[4]  On average, the

Debtors spend approximately $35,370 in the aggregate each month for utility services.  Prior to

the Petition Date, the Debtors believe they were current on payments to the Utility Providers.

46.     Uninterrupted utility services are essential to the Debtors' ongoing operations

and, therefore, to the success of their reorganization.  Any interruption of utility services would

negatively affect the Debtors' operations, customer relationships, revenues and profits, seriously

---

[4] Although the Debtors believe that the Utility Service List includes all of the Utility Providers, the Debtors reserve the right to supplement the Utility Service List if they have inadvertently omitted any Utility Provider. Additionally, the listing of an entity on the Utility Service List is not an admission that such entity is a utility within the meaning of Bankruptcy Code section 366, and the Debtors reserve the right to contest any such characterization in the future.

jeopardizing the Debtors' reorganization efforts. Therefore, it is critical that utility services continue uninterrupted during these chapter 11 cases.

47.     The Debtors anticipate that the cash flow from operations and cash on hand as well as their post-petition credit facility will be sufficient to pay all post-petition obligations related to their utility service. Nevertheless, to provide additional assurance of payment for future services to the Utility Providers, the Debtors propose to deposit an amount equal to the cost of two weeks of utility service, calculated as a historical average over the past 12 months (the "Adequate Assurance Deposit"), into a newly created, segregated, interest-bearing account (the "Adequate Assurance Deposit Account") for Utility Providers.[5] The Debtors believe that the Adequate Assurance Deposit coupled with the Debtors' demonstrated ability to pay for future utility services in the ordinary course of business (collectively, the "Proposed Adequate Assurance") constitutes sufficient adequate assurance to the Utility Providers.

48.     The Proposed Adequate Assurance provides more than adequate assurance of payment to the Utility Providers. The Debtors expect that their revenue from continued operations coupled with their cash on hand along with their post-petition credit facility will be sufficient to pay their operating costs, including utility costs, as they come due. These factors, which the Court may consider when determining the amount of any adequate assurance payments, justify a finding that the Proposed Adequate Assurance is more than sufficient to assure the Utility Providers of future payment.

---

[5] The Debtors further request that any Adequate Assurance Deposit that is deposited into the Adequate Assurance Deposit Account on behalf of any Utility Provider be returned to the Debtors at the conclusion of these cases.

49.   To ensure that all Utility Providers receive adequate notice and opportunity to object to the relief sought herein, the Debtors propose that the Court approve and adopt the following procedures (the "Adequate Assurance Procedures"):

- The Debtors request that the Court schedule the Final Hearing on the Motion no later than thirty (30) days after the Petition Date.

- The Debtors will serve a copy of notices, in substantially the form attached hereto as **Exhibit E**, of the Final Hearing, together with the Interim Order, on each Utility Provider no later than two (2) business days after entry of the Interim Order.

- If a Utility Provider is not satisfied with the Proposed Adequate Assurance provided by the Debtors, the Utility Provider must serve a request for additional adequate assurance (the "Additional Assurance Request") so that it is received by the Debtors at the following addresses: (i) Edge Petroleum Corporation, 1301 Travis St., #2000, Houston, Texas 77002 and (ii) Akin Gump Strauss Hauer & Feld LLP, 1700 Pacific Avenue, Suite 4100, Dallas TX 75201, Attn. Charles R. Gibbs, Esq., counsel to the Debtors.

- Any Additional Assurance Request must (i) be in writing; (ii) set forth the location(s) for which Utility Services are provided; (iii) include a summary of the Debtors' payment history relevant to the affected account(s), including any security deposits, and (iv) set forth why the Utility Provider believes that the Proposed Adequate Assurance is not sufficient additional adequate assurance of future payment.

- Without further order of the Court, the Debtors may enter into agreements granting additional adequate assurance to a Utility Provider serving an Additional Assurance Request, if the Debtors, in their discretion, determine that the Additional Assurance Request is reasonable.

- If the Debtors determine that the Additional Assurance Request is not reasonable and are not able to reach an alternative resolution with the Utility Provider, the Debtors will request a hearing (the "Determination Hearing") before this Court within a reasonable time after receipt of the Additional Assurance Request to determine the adequacy of assurance of payment with respect to a particular Utility Provider pursuant to section 366(c)(3) of the Bankruptcy Code. Such hearing will be without prejudice to the right of any Utility Provider to seek relief separately under section 366(c)(3) of the Bankruptcy Code.

- Pending resolution of such dispute at the Determination Hearing, the relevant Utility Provider shall be restrained from altering, refusing, or discontinuing service to the Debtors on account of unpaid charges for prepetition services or on account of any objections to the Proposed Adequate Assurance.

- The Proposed Adequate Assurance shall be deemed adequate assurance of payment for any Utility Provider that fails to make an Additional Assurance Request.

**F.     Motion of the Debtors for Entry of an Order Authorizing the Debtors to Pay Pre-petition Claims of Certain Critical Vendors and Approving Procedures Related Thereto**

50.     In connection with the normal operation of their businesses, the Debtors rely heavily on certain service providers. The Debtors believe that the services supplied by a limited number of these vendors (the "Critical Vendors") are critical to their operations. As of the Petition Date, certain of the Critical Vendors have outstanding claims against the Debtors arising from pre-petition deliveries of goods and performance of services (the "Critical Vendor Claims"). Nonpayment of the Critical Vendor Claims creates a significant risk of disruption to the Debtors' operations. The Debtors, accordingly, anticipate that payment of the Critical Vendor Claims will benefit all creditors because such payment will allow the Debtors' businesses to avoid a likely loss or gain a likely economic advantage that is disproportionate to the amount of the pre-petition claims. Accordingly, the Debtors request that the Court: (i) establish procedures by which the Debtors may pay the Critical Vendors; and (ii) authorize, but not direct, the Debtors to make such payments.

51.     The Debtors have distinguished the Critical Vendors according to the following criteria:

- Whether a vendor is a "sole source" vendor.

- Whether the Debtors' businesses would be significantly disrupted during replacement of the vendor, and whether the Debtors have the capacity to operate until a replacement vendor is found.

- Whether a vendor is entitled to a claim under Bankruptcy Code section 503(b)(9) for goods provided to the Debtors twenty (20) days prior to the Petition Date.

- Whether an agreement exists which could compel the vendor to maintain its relationship with the Debtors, or whether a vendor will be able to refuse future performance under an agreement if its pre-petition claims are not paid (such as

through a "safe harbor" provision in the Bankruptcy Code which permits termination).

- Whether failure to pay a vendor would result in higher costs or loss of significant sales to the Debtors.

- Whether failure to pay a vendor would result in a liquidity crisis for that vendor.

52.     The Debtors intend to pay Critical Vendor Claims in either a lump-sum payment or over time based upon negotiations with each Critical Vendor and only to the extent that such payments are necessary to preserve the Debtors' businesses. The Debtors will use best efforts to condition payments to Critical Vendors upon each Critical Vendor's entry into a letter agreement with the Debtors (the "Vendor Agreement") that includes, among other things, the following terms:

- The Critical Vendor will continue supplying goods throughout the chapter 11 cases on the normal and customary trade terms, practices and programs (including, credit limits, pricing, cash discounts, timing of payments, and allowances) which were (a) most favorable to the Debtors and in effect between such vendor and the Debtors on a historical basis within 180 days of the Petition Date, (b) such other trade terms, practices or programs that are at least as favorable to the Debtors as those that were in effect before the Petition Date, or (c) such other trade terms that would be common in the industry and are acceptable to the Debtors in their business judgment (the "Customary Trade Terms") so long as the Debtors are not then in post-petition default;

- The Critical Vendor acknowledges it has reviewed the applicable motion and the order approving this Motion and agrees to be bound by such terms and provisions;

- If a Critical Vendor refuses to supply products or services to the Debtor on Customary Trade Terms after receiving payment pursuant to the Order, any payments received by the Critical Vendor will be deemed to have been in payment of then outstanding post-petition obligations owed to the Critical Vendor and the Critical Vendor will immediately repay to the Debtors any payments made to it on account of its Critical Vendor Claim to the extent that the aggregate amount of such payments exceeds the post-petition obligations then outstanding (without the right of any setoffs, claims, provision for payment of reclamation or trust fund claims);

- The Critical Vendor will not file or otherwise assert against the Debtors, their assets or any other person or entity (or any of their respective assets or property whether real or personal), any lien (regardless of the statute or other legal authority upon which such lien is asserted) related in any way to any remaining pre-bankruptcy amounts

allegedly owed to the Critical Vendor by the Debtors arising from agreements entered into prior to the Petition Date and will take the necessary steps to remove any lien obtained prior to the Vendor Agreement as soon as possible;

- The Critical Vendor will not separately assert or otherwise seek payment of any reclamation claims; and

- To the extent there exist any safe-harbor contracts between the Debtors and the Critical Vendor that contain a right of termination based on the Debtors' bankruptcy, insolvency, or other similar conditions, the Critical Vendor will waive the filing of bankruptcy by or the insolvency or other similar conditions of the Debtors as a termination right under those contracts for the duration of the Vendor Agreement. All other default, suspension and termination provisions in such contracts shall remain in effect.

A copy of the Vendor Agreement is attached hereto as **Exhibit F**.

53.     There exists the significant possibility that a default by the Debtors as to amounts owed to certain of the Critical Vendors would extinguish the Debtors' access to necessary goods and services because, among other things: (i) a Critical Vendor may refuse to continue doing business with the Debtors if its pre-petition claim remains unpaid; or (ii) a Critical Vendor may choose to continue doing business with the Debtors only upon the condition that the Debtors provide trade term accommodations such as advance deposits or payment by wire transfer prior to delivery. The goods and services provided to the Debtor by the Critical Vendors are crucial to the operations of the Debtors. If the Debtors are unable to obtain these services, they would be unable to function in even the most rudimentary fashion. Accordingly, a sound business justification exists to make payments for such goods and services, and relief under Bankruptcy Code section 363(b) is warranted.

G.     **Debtors' Motion Pursuant to Bankruptcy Code Sections 363(b) and 507(a) for an Order (I) Authorizing Payment of Wages, Compensation, Benefits, and Other Employee Obligations and (II) Authorizing Financial Institutions to Honor and Process Checks and Transfers Related to Such Obligations**

54.     In the ordinary course of their business, the Debtors incur payroll and various other obligations and provide other benefits to their employees for the performance of services.

As of September 30, 2009, the Debtors directly employed forty-six (46) full-time individuals[6] and one (1) part-time individual (collectively the "Employees").[7] The Debtors have certain pre-petition costs and obligations relating to the Employees that may be outstanding, due, and payable, while others will become due and payable in the ordinary course of business after the Petition Date (collectively, the "Employee Obligations"). The Debtors request that the Court authorize the Debtors (a) to pay, in their sole discretion, all obligations incurred under or related to the Employee Obligations, and (b) to maintain and continue to honor their practices, programs, and policies for the Employees as they were in effect as of the Petition Date, and as such may be modified, amended, or supplemented from time to time in the ordinary course; and (ii) authorize the banks and other financial institutions listed on **Exhibit G** to receive, honor, process, and pay any and all checks drawn on the Debtors' disbursement accounts and automatic payroll transfers, to the extent that such checks or transfers relate to any of the foregoing.

55.     As described below, the Debtors estimate that the aggregate amount of the Employee Obligations, including, but not limited to, the Wage Obligations, the Contractual Obligations, the Incentive Awards, the Payroll Taxes, the Employee Benefits, and the Retirement Benefits (each as defined below) does not exceed approximately $470,000.[8]

(i)     ***Wage Obligations***

56.     In the ordinary course of business, the Debtors typically pay wages and salaries (collectively, the "Wage Obligations") to the Employees on a semi-monthly basis through paychecks or direct deposits into Employees' accounts (typically on the 15th and the last

---

[6] On or about September 30, 2009, the Debtors terminated nine (9) employees. Accordingly, as of October 1, 2009, the Debtors employed thirty-seven (37) full-time individuals and one (1) part-time individual.

[7] In addition, there exist approximately nine (9) individuals or entities that are employed by the Debtors on a contractual basis.

[8] This amount includes accrued but unused vacation pay with a value of approximately $225,000 as of September 30, 2009. The Debtors' vacation policy does not allow Employees to cash out accrued vacation.

business day of each month). The Debtors have engaged Fidelity Investments ("Fidelity") to facilitate payment of the wages and salaries. In the ordinary course of business, Fidelity pays the Employees their respective Wage Obligations on behalf of the Debtors.[9]   To facilitate this process, Fidelity collects the payroll invoices by automated clearing house ("ACH") debit to the Banks two (2) days prior to distributing payroll checks or making ACH credits to the Employees. The Debtors' most recent payroll invoices were paid on September 30, 2009. As of the Petition Date, the Debtors do not owe any pre-petition Wage Obligations.[10]

> (ii)     ***Contractual Obligations***

57.     In addition to the Employees, there exist approximately nine (9) individuals or entities that are employed by the Debtors on a contractual basis (collectively, the "Contractual Employees").[11]   The Contractual Employees are not direct employees of the Debtors, and as such: (i) have no accrued Wage Obligations; (ii) are not subject to withholding of Payroll Taxes (as defined below); (iii) are not eligible for Employee Benefits (as defined below); and (iv) are not eligible to participate under the 401(k) Plan (as defined below). Rather, the Contractual Employees include, among others, providers of goods and services that are crucial to the Debtors' operations. Payment of pre-petition obligations to the Contractual Employees is key to the functioning of the Debtors, as the Debtors require the goods and services provided by the Contractual Employees to function on a daily basis. As of the Petition Date, the Debtors'

---

[9] Fidelity is paid a fee of approximately $500 to $600 per month for the provision of payroll services, which includes withholding payroll taxes (the "Fidelity Payroll Service Fees"). Payment of these modest fees is crucial for the Debtors' seamless entry into chapter 11 and to ensure that all Employees are paid timely and accurately post-petition. As of the Petition Date, the Debtors owe approximately $500 for the Fidelity Payroll Service Fees for the month of September 2009.

[10] The Debtors' normal semi-monthly gross payroll is approximately $207,000.

[11] The Contractual Employees are: (a) James G. Brown, Contract Drilling Consultant, (b) Jesse J. Allen, Contract Production Manager, (c) Cheryl Ketchie, Contract Financial Consultant, (d) Gladys Gordon, Contract Revenue Accountant, (e) David Timms, Contract Revenue Accountant, (f) Charmaine Martin, Contract Revenue Accountant, (g) Jeff Hurst, Contract Draftsman, (h) Khan Liakat, Contract Engineering Technologist, and (i) Bill Michalak, Contract Landman.

obligations with respect to the Contractual Obligations total approximately $75,000 in the aggregate.

### (iii)    *Incentive Awards*

58.     In order to attract and retain key Employees, certain of those Employees whose performance is deemed superior by the Debtors are eligible for awards of: (i) stock options; (ii) stock appreciation rights; (iii) stock awards; (iv) cash awards; and (v) performance awards (collectively, the "Incentive Awards"). As of the Petition Date, the Debtors' obligations with respect to the Incentive Awards total approximately $90,000 in the aggregate, consisting of unvested employee stock awards.[12]

### (iv)    *Payroll Taxes*

59.     The Debtors are required by law to withhold amounts related to federal, state, and local income taxes, as well as social security and Medicare taxes (collectively, the "Withholding Taxes"), from Wage Obligations and to remit the same to the appropriate Taxing Authorities. In addition, the Debtors are required to make matching payments on account of social security and Medicare taxes and to pay, based on a percentage of gross payroll and subject to state-imposed limits, additional amounts to the Taxing Authorities for, among other things, state and federal unemployment insurance (collectively, the "Employer Payroll Taxes" and, together with the Withholding Taxes, the "Payroll Taxes"). As of the Petition Date, the Debtors do not owe any obligations with respect to the Payroll Taxes.[13]

---

[12] This amount uses an estimated price of $0.60 per share. The Debtors also have outstanding stock options, all of which are currently under water.

[13] The Debtors' average semi-monthly obligation for Payroll Taxes is approximately $53,000.

(v)    ***Employee Benefits***

60.    As described in greater detail herein, the Debtors owe the Employees outstanding pre-petition amounts with respect to certain plans, policies, and programs currently in place with respect to various employee benefits (collectively, the "Employee Benefits"). As of the Petition Date, the Debtors do not owe any obligations with respect to the Employee Benefits.[14]

(1)    Health Benefits[15]

61.    The Debtors offer medical, dental, and vision coverage to their full-time Employees (collectively, the "Health Benefits"). The Health Benefits are administered through Guardian Life Insurance Company of America ("Guardian").

(a)    Medical

62.    Medical coverage includes, among other things: (i) office visits; (ii) preventive care; (iii) emergency room services; (iv) ambulance services; (v) inpatient and patient hospital services; (vi) x-ray and laboratory services; (vii) outpatient therapy; (viii) home healthcare services; (ix) medical equipment and supplies; and (x) prescription drugs. The Debtors pay 100% of the premiums for medical insurance for each full-time Employee. The Debtors pay 75% of the premiums for coverage of dependents through age twenty-five (25) (through age twenty-six (26) if the dependent is a full-time student), with the balance contributed by the Employees thorough payroll withholding. All of the Debtors' Employees participate in the Debtors' medical insurance plan.

---

[14] The Debtors estimate that the average monthly cost for Employee Benefits is approximately $65,000.

[15] In accordance with the Consolidated Omnibus Budget Reconciliation Act ("COBRA"), Employees and their family members are entitled to a temporary extension of medical and dental insurance in certain situations in which coverage would otherwise end (e.g., loss of dependency in the case of a child, divorce in the case of a spouse, termination of employment).

(b)   Dental

63.     Dental coverage includes, among other things: (i) preventive dental services including periodontal maintenance procedures, office visits and examinations, space maintainers, radiographs, and sealers; (ii) basic dental services including diagnostic services, restorative services, endodontic services, periodontal services and surgery, and non-surgical/surgical extractions; (iii) major dental services including various major restorative services and prosthodontic services; and (iv) orthodontic services. The Debtors pay 100% of the premiums for dental insurance for each full-time Employee. The Debtors pay 75% of the premiums for coverage of dependents through age twenty-five (25) (through age twenty-six (26) if the dependent is a full-time student), with the balance contributed by the Employees thorough payroll withholding. All of the Debtors' Employees participate in the Debtors' dental insurance plan.

(c)   Vision

64.     Vision coverage includes, among other things: (i) vision examinations; (ii) standard lenses and frames; and (iii) necessary and elective contact lenses. The Debtors pay 100% of the premiums for vision insurance for each Employee. The Debtors pay 75% of the premiums for coverage of dependents through age twenty-five (25) (through age twenty-six (26) if the dependent is a full-time student), with the balance contributed by the Employees thorough payroll withholding. All of the Debtors' Employees participate in the Debtors' vision insurance plan.

(2)   Group Benefits Plan

65.     The Debtors provide their full-time Employees with basic life insurance, voluntary life insurance, accidental death and dismemberment insurance, short-term disability,

and long-term disability (collectively, the "Group Benefits Plan"). The Group Benefits Plan is administered through Guardian.

(a)    <u>Basic Life Insurance</u>

66.    The Debtors pay 100% of premiums for basic life insurance coverage for all full-time Employees. Under the basic life insurance plan, in the event of an Employee's death, the Employee's designee is entitled to two times annual base salary, not to exceed $500,000.

(b)    <u>Voluntary Life Insurance</u>

67.    The Employees have the option of purchasing voluntary life insurance in addition to basic life insurance. Employees may elect: (i) benefit coverage for themselves which may range from $20,000 to $300,000; (ii) spousal coverage in the amount of 50% of the Employee's amount to a maximum of $50,000; and (iii) child coverage up to age twenty-three (23) (up to age twenty-five (25) if a full-time student) in the amount of 10% of the Employee's amount to a maximum of $10,000.

(c)    <u>Accidental Death and Dismemberment</u>

68.    The Debtors pay 100% of premiums for accidental death and dismemberment insurance ("AD&D Insurance") for all full-time Employees. Under the basic AD&D Insurance plan, in the event of an Employee's death, the Employee's designee is entitled to two times annual base salary, not to exceed $500,000 (the "Insurance Amount"). In the event that an Employee suffers an irreversible dismemberment, the Employee is entitled to the following amounts: (i) loss of hand – 50% of Insurance Amount; (ii) loss of foot – 50% of Insurance Amount; (iii) loss of sight in one eye – 50% of Insurance Amount; and (iv) loss of thumb and index finger of same hand – 25% of Insurance Amount.

(d)      Short-term Disability

69.      The Debtors' short-term disability insurance program replaces part of an Employee's income if the Employee becomes disabled due to sickness or injury. The Debtors pay 100% of premiums for short-term disability insurance. Employees qualify for short-term disability after 30 days of disability and entitled to up to nine weeks of coverage.[16] Benefits paid to Employees under short-term disability are equivalent to 60% of base pay, with a weekly maximum benefit of $1,000. As of the Petition Date, one (1) Employee is drawing short-term disability.

(e)      Long-term Disability

70.      The Debtors' long-term disability insurance program replaces part of an Employee's income if the Employee becomes disabled due to sickness or injury. The Debtors pay 100% of premiums for long-term disability insurance. Employees qualify for long-tem disability after ninety (90) days of disability, and benefits may be paid until age sixty-five (65) so long as the Employee continues to qualify.[17] Benefits paid to Employees under long-term disability are equivalent to 60% of base pay, with a monthly maximum benefit of $10,000. No Employees are currently drawing long-term disability.

(3)      Leave Benefits

71.      In certain circumstances, the Debtors provide paid leave benefits to Employees to accommodate specific personal employee matters, such as maternity leave, bereavement leave,

---

[16] Because the Employees' short-term disability benefits do not begin until after thirty (30) days of disability, the Debtors have also implemented a short-term salary continuation plan (the "Continuation Plan") which provides normal pay to Employees for the time period between the end of any available, unused sick days and the commencement of the short-term disability plan.

[17] If the disability occurs at age 60, benefits are paid according to a graduated time schedule which ranges from five years at age 60 to twelve months at age 69 and older.

sick leave, and leave under the Family and Medical Leave Act (collectively, the "Leave Benefits"). The Leave Benefits are composed of the following categories:

- **Maternity Leave**: Employees are entitled to receive up to twelve (12) weeks of paid maternity leave, which breaks down as follows: (i) first thirty (30) days - full pay under the Continuation Plan; (ii) next two (2) weeks (normal delivery) to four (4) weeks (Cesarean delivery) – 60% of full pay under short-term disability; and (iii) next thirty (30) days – full pay provided by the Debtors.

- **Bereavement Leave**: In the event of a death in the immediate family, full-time Employees are entitled to up to three (3) days paid bereavement leave.

- **Sick Leave**: Full-time Employees are eligible for five (5) days of paid sick leave per year. If an Employee does not use all sick days to which the Employee is entitled, the Employee may carry over the unused days for future use. An Employee can accumulate or bank up to a maximum of twenty-five (25) paid sick days, and these "banked" days can be used after an Employee has used all of his or her current year's annual sick days.

- **Family and Medical Leave Act**: The Debtors grant leave in accordance with the Family and Medical Leave Act of 1993 ("FMLA") to Employees who have been with the Debtors for at least twelve (12) months and have completed at least 1,250 hours of service with the Debtors during the twelve (12) months preceding the leave request. FMLA grants eligible Employees the right to unpaid leave for up to twelve (12) weeks in any twelve (12) month period for one or more of the following reasons: (i) to care for a child during the first year after birth or placement for adoption or foster; (ii) to care for a parent, spouse, or child with a serious health condition; and (iii) because of the Employee's own serious health condition.

    (4)   Business Expense Reimbursement

72.    In the ordinary course of their business, the Debtors routinely reimburse the Employees for actual and reasonable business expenses including: (i) business meals; (ii) lodging and transportation; (iii) seminars and training; (iv) personal automobile usage; (v) miscellaneous and billable expenses; and (vi) vehicle rentals after submission of appropriate documentation to the Debtors' accounting department.

### (5)   Long Term Care Insurance Plan

73.     The LongTerm Care Insurance Plan (the "LongTerm Program") is a voluntary benefit whereby the Employees are eligible to receive a group discount for various nursing home care services. This plan is administered by Massachusetts Mutual. Currently, there is one (1) Employee participating in the LongTerm Program.

### (6)   Education Reimbursement

74.     The Debtors have established an education assistance program for Employees who wish to obtain formal education in order to better qualify themselves for future opportunities with the Debtors. The reimbursement program assists Employees in the completion of approved part-time courses at universities, colleges, vocational schools, and correspondence schools. Levels of tuition reimbursement are dependent upon the Employee's class performance: (i) A = 100%; (ii) B = 100%; (iii) C or pass = 75%; and (iv) D or F = 0%. The maximum reimbursement is $5,250 annually. Currently, there are two (2) Employees who utilize education reimbursement benefits.

### (7)   Paid Parking/Bus Pass

75.     All Employees are eligible to receive paid parking for their vehicle or, in the event the Employee does not ride a vehicle to work, a paid bus pass. All of the Debtors' Employees utilize this benefit.[18]

### (8)   Flex Benefit Plan

76.     The Debtors provide the Employees with a flexible benefits plan (the "Flex Benefit Plan") which, pursuant to section 125 of the Internal Revenue Code, allows Employees to use pre-tax dollars to receive reimbursement for group health and dental program premiums,

---

[18] The average monthly cost for paid parking and bus passes is approximately $6,700.

unreimbursed health care expenses for self and eligible dependents, and dependent care costs. An Employee may dedicate a maximum of $5,000 towards this plan. The Flex Benefit Plan is administered by MBG Co-Sourcing Solutions, LLC.

### (9)   Workers' Compensation

77.   The Debtors maintain workers' compensation and employer liability insurance on behalf of the Employees.

### (10)   Unemployment Compensation

78.   The Debtors comply with all state regulations regarding state-sponsored unemployment compensation.

### (vi)   *Retirement Benefits*

79.   The Debtors maintain a 401(k) plan (the "401(k) Plan") to assist Employees in saving towards retirement on a tax-deferred basis. The Debtors withhold, from the wages of participating Employees, contributions towards the 401(k) Plan, and provide the Employees with a quarterly match of 100% of the first 8% of contributions. Employee contributions to the 401(k) savings plan are deducted and forwarded, with the Debtors' matching contributions,[19] to Fidelity, the Debtors' 401(k) manager, for investment.[20] As of the Petition Date, the Debtors' obligations with respect to the Retirement Benefits total approximately $80,000 in the aggregate.

---

[19] The average semi-monthly employee contribution total is approximately $19,100.

[20] Fidelity is paid a quarterly fee of approximately $4,875 for service related to the Debtors' 401(k) Plan. Payment of this fee is crucial for the Debtors' seamless entry into chapter 11 and to ensure this benefit is accurately managed. As of the Petition Date, the Debtors owe Fidelity approximately $1,625 for services related to the 401(k) Plan.

**H.    Debtors' Motion Pursuant to Bankruptcy Code Sections 105(a), 345(b), 363(b), 363(c) and 364(a) and Bankruptcy Rules 6003 and 6004 for (A) Authorization to (I) Continue Using Existing Centralized Cash Management System, as Modified, (II) Honor Certain Pre-petition Obligations Related to the Use of the Cash Management System, and (III) Maintain Existing Bank Accounts and Business Forms; and (B) for Authorization to Continue Current Investment Policies Pursuant to Bankruptcy Code Section 345(b)**

80.    Prior to the Petition Date, in the ordinary course of business, the Debtors used a centralized cash management system (the "Cash Management System") to efficiently collect, transfer, and distribute funds generated by business operations.  The components of the Cash Management System are organized around three principal functions: cash collection, concentration, and disbursement.  The Cash Management System facilitates cash monitoring, forecasting, and reporting, and enables the Debtors to maintain control over the administration of their bank accounts (the "Bank Accounts") located at banks and other financial institutions (collectively, the "Banks").  Attached hereto as **Exhibit H** is a list of the Bank Accounts. Attached hereto as **Exhibit I** is a chart illustrating the flow of funds through the pre-petition Cash Management System.

(i)    *Cash Collection*

81.    The Debtors generate and receive funds primarily from oil and natural gas sales. The Debtors' production is sold at the well-head at field-posted prices and natural gas is sold under contract at a negotiated monthly price based upon factors normally considered in the industry, such as: (i) conditioning or treating to make gas marketable; (ii) distance from the well to the transportation pipeline; (iii) well pressure; (iv) estimated reserves; (v) quality of natural gas; and (vi) prevailing supply and demand conditions.  The Debtors accept payment by cash, check, wire, and automated clearing house transfers ("ACH Transfers").

### (ii)    *Concentration*

82.    For purposes of concentration, the Debtors currently have three deposit accounts with Compass Bank ("Compass") where the funds they generate are deposited. Two of the deposit accounts are zero balance accounts (the "Zero Balance Deposit Accounts"), and the funds in these accounts are swept into the main operating account, which is the third deposit account (the "Operating Account," and together with the Zero Balance Operating Accounts, the "Deposit Accounts"). If the daily closing balance in the Operating Account exceeds $1,000,000, all balances in excess of $1,000,000 are swept into an overnight sweep account. Swept funds are credited back along with interest to the Operating Account at the opening of business the following day.

### (iii)    *Disbursements*

83.    The Debtors regularly calculate the funds required to pay disbursements. Disbursements are generally funded through five disbursement accounts. Disbursements are made via checks, wires, and ACH Transfers. Disbursements are made for commitments such as office costs, operating costs, revenue distributions, and payroll.

### (iv)    *Proposed Modified Cash Management System*

84.    As discussed herein, to ensure compliance with Bankruptcy Code, the Debtors have opened new accounts with the Union Bank of California (the "New Bank Accounts"), whom the Debtors understand is designated as an "Authorized Bank Depository" by the U.S. Trustee. The New Bank Accounts generally are parallel in structure and function to the Bank Accounts. However, in order to ensure the smooth continued operation of the Debtors' business, particularly as it pertains to the collection of payments due to the Debtors, the Debtors' seek approval to maintain the Deposit Accounts. The Zero Balance Deposit Accounts and the

Operating Account will be swept nightly[21] into the Union Bank of California operating account (the "UBC Operating Account"). Since the balances of the Deposit Accounts will be swept nightly into the UBC Operating Account, the Debtors believe the continued use of the Deposit Accounts would not pose any potential harm to the estate, and would avoid unnecessary confusion that will be created by requiring deposits to be made to new accounts. Attached hereto as **Exhibit J** is a chart illustrating the flow of funds through the proposed modified Cash Management System

85.     The Debtors' business operations require the Debtors to send periodic revenue distributions to royalty owners (the "Royalty Payments"). It is important to the Debtors' relationships with the royalty owners that the Royalty Payments are not delayed or encumbered in any way. The Debtors utilize an outside service, Cathedral Corporation, to prepare the Royalty Payments. Royalty Payments were most recently mailed on September 25, 2009,[22] and are drawn on a deposit account (the "Royalty Account"). The Debtors seek approval to maintain a balance sufficient to satisfy outstanding Royalty Payments in the Royalty Account for a period of thirty (30) days from the Petition Date. The Debtors believe this will provide sufficient time to process a majority of the Royalty Payments without delay or confusion.

86.     During the 30-day period, the Debtors will also open a similar deposit account with the Union Bank of California and the October 26, 2009 Royalty Payments will be issued from the new account. At the conclusion of the 30-day period, the Debtors will close the

---

[21] In order to avoid incurring financing fees, the Debtors seek authority to leave a balance of $5,000 in the Operating Account each night.

[22] Contemporaneous with the filing of this Motion, the Debtors also have filed their Debtors' Motion for an Order Authorizing the Debtors to Pay or Honor Pre-petition and Post-petition Royalty Obligations and Other Obligations Under Oil and Gas Leases (the "Royalty Motion"), which seeks authority to pay any and all pre-petition Royalty Payments. If the Royalty Motion is not approved by the Court, the Debtors will direct Compass not to honor any checks drawn on the Royalty Account.

Royalty Account. The Debtors believe that such use of the Royalty Account would not pose any potential harm to the estate and would avoid unnecessary confusion and delay to the royalty owners.

### (v) *Honoring Certain Pre-Petition Obligations of the Debtors Related to the Cash Management System is in the Best Interests of the Debtors, Their Estates, and All Parties in Interest*

87.     In connection with their use of the Cash Management System, the Debtors incur periodic service charges and other fees to the Banks for the maintenance of the Cash Management System (the "Service Charges"). The Debtors believe that as of the Petition Date there are unpaid pre-petition Service Charges for the month of September 2009 in the amount of approximately $3,000, which amount will be debited from the Debtors' Bank Accounts on or about the 15th of October 2009, in the ordinary course of business. The Debtors request authority to pay any pre-petition Service Charges that remain unpaid as of the Petition Date. Payment of the pre-petition Services Charges is in the best interests of the Debtors, their estates, and all parties in interest as it will prevent any disruption to the Cash Management System. Because the Banks have setoff rights with respect to the Service Charges, payment of any pre-petition Service Charges will not affect unsecured creditors and paying any pre-petition Service Charges would merely be a matter of timing.

### (vi) *Maintenance of the Debtors' Existing Bank Accounts and Business Forms is Warranted*

88.     As part of the Cash Management System, the Debtors maintain approximately eight Bank Accounts. The Debtors routinely deposit and withdraw funds from the Bank Accounts by checks, wire transfers, and ACH Transfers. Rigid adherence to the U.S. Trustee's "Operating Guidelines and Reporting Requirements For Debtors in Possession and Trustees" (the "Guidelines") may require, as of the Petition Date, the closure of the Bank Accounts, the

opening of new accounts, and the immediate printing of new checks with the full name of the relevant debtor in possession exactly as it appears on the voluntary petition as well as a "Debtor in Possession" and case number designation. The Debtors believe, however, that their transition to chapter 11 will be smoother, less costly, and more orderly, and disruption and harm to their Cash Management System will be minimized, if certain of the Bank Accounts are continued for a period of time, as discussed herein, following the commencement of these cases; provided, however, that checks issued or dated prior to the Petition Date will not be honored absent a prior order of the Court.

89.     Unless otherwise ordered by this Court, no Bank shall honor or pay any check issued on account of a pre-petition claim. The Debtors request that the Banks be authorized to accept and honor all representations from the Debtors as to which checks, drafts, wire transfers, ACH Transfers (collectively, the "Transfers"), or other debits should be honored or dishonored consistent with any order(s) of this Court, whether or not the Transfers are dated prior to, on, or subsequent to the Petition Date. The Banks shall not be liable to any party on account of following the Debtors' instructions or representations regarding which Transfers should be honored. The Banks also shall be permitted to accept and process chargebacks against the Bank Accounts arising out of returned deposits into such accounts without regard to the date such return item was deposited.

90.     By preserving business continuity and avoiding disruption and delay to the Debtors' disbursement obligations, including payroll, that necessarily would result from closing all of the Bank Accounts, all parties in interest, including employees, vendors, and customers, will be best-served. The confusion that otherwise would result, absent the relief requested herein, would ill-serve the Debtors' rehabilitative efforts. Accordingly, the Debtors respectfully

request authority to maintain certain Bank Accounts, as discussed herein, in the ordinary course of business.

91.      In addition, to minimize expenses, the Debtors further request that they be authorized to continue to use their correspondence and business forms, including, but not limited to, purchase orders, multi-copy checks, letterhead, envelopes, promotional materials, invoices, and other business forms (collectively, the "Business Forms"), substantially in the forms existing immediately before the Petition Date, without reference to their status as debtors in possession; provided, however, that the Debtors shall commence marking the full name of the relevant debtor in possession exactly as it appears on the voluntary petition as well as the term "Debtor in Possession" and the chapter 11 case number under which these cases will be jointly administered on their existing check stock and wire transfer instructions instead of having new stock printed with such marking.

92.      If the Debtors are not permitted to maintain and utilize certain of the Bank Accounts and their existing Business Forms, the resultant prejudice will include significant: (i) disruption to the Debtors' ordinary financial affairs and business operations; (ii) delay in the administration of the Debtors' estates; (iii) damage to the Debtors' relationships with royalty owners; and (iv) cost to the estates to set up new systems, print new business forms, and print new checks. Accordingly, authorization to maintain certain Bank Accounts and Business Forms is appropriate in these chapter 11 cases.

I.      **Debtors' Emergency Motion for an Order (i) Authorizing the Debtors' Interim and Final Use of Cash Collateral; (ii) Granting Adequate Protection; and (iii) Scheduling a Final Hearing Regarding Use of Cash Collateral**

93.      The Debtors seek (a) interim authority to use Cash Collateral (as defined below) of the Pre-petition Lenders in accordance with the terms and conditions set forth herein and in accordance with the proposed interim budget (the "Interim Budget") and interim order (the

"Interim Order"); (b) authority to use Cash Collateral (as defined below) on a final basis in accordance with a proposed final budget (the "Final Budget") and final order (the "Final Order"); (c) granting adequate protection to the Pre-petition Lenders in the Pre-petition Collateral pursuant to Bankruptcy Code sections 361 and 363(c); (d) scheduling a final hearing (the "Final Hearing") regarding the Debtors' use of Cash Collateral.

94.     The Administrative Agent asserts that the pre-petition obligations under the Credit Agreement are secured by first priority, valid, binding, perfected and enforceable liens and security interests (the "Pre-petition Liens") granted by the Debtors to the Administrative Agent, for the benefit of the Pre-petition Lenders, under the Credit Agreement and other documents executed in connection therewith, including, but not limited to, any notes, letter of credit documents, security interests, mortgages, guarantees, or other agreements or instruments (all of the foregoing, together with the Credit Agreement, referred to as the "Pre-petition Indebtedness Documents") upon and in all of the assets and property of the Debtors whether then owned or thereafter acquired or arising, and all proceeds and products thereof, and all of the equity interests and all related rights with respect to the Debtors (collectively, the "Pre-petition Collateral").

95.     The Administrative Agent asserts that all of the cash of Edge in existence on the Petition Date and that is acquired by Edge thereafter constitutes cash collateral (the "Cash Collateral") within the meaning of Bankruptcy Code section 363(a) for the benefit of the Administrative Agent and the Pre-petition Lenders.

96.     The Debtors have an immediate need to use Cash Collateral, including cash proceeds, to continue their ordinary course business operations and to maintain the value of their bankruptcy estates.  Without such funds, the Debtors will not be able to pay costs and expenses,

including, but not limited to, wages, salaries, professional fees, general and administrative operating expenses or other expenses that arise in the administration of these bankruptcy cases and in the ordinary course of the Debtors' businesses.

97.    The Debtors require the ability to use Cash Collateral to maintain the operation of their businesses and preserve their going-concern value.    The Debtors request interim authorization to use Cash Collateral solely for such purposes set forth in the Interim Budget until a Final Order granting further use of Cash Collateral can be entered.  If the Debtors are unable to timely pay the costs and expenses set forth in the Interim Budget, their businesses will suffer immediate and irreparable harm, and the value of their assets will decline.  Because the Debtors' request for interim authorization seeks the use of only that amount of Cash Collateral as is necessary to avoid immediate and irreparable harm to the value of their assets pending a final hearing, their request complies with Bankruptcy Rules 4001(b)(2) and 6003.

98.    The Interim Budget itemizes the sources and uses of cash and provides a projection of cash receipts and expenditures.  The Interim Budget includes a list of business expenses that are reasonable and necessary and that must be paid in order to continue the Debtors' businesses until such time as a Final Hearing can be held.  The Debtors propose that any amounts listed in the Interim Budget that are unused in any week may be carried over and used by the Debtors in any subsequent week, on a line-item basis (i.e., any unused amounts in a line item in a given week may carry over to that line item to a subsequent week or weeks).  The Debtors also request that there shall be a permitted variance of 10% for any amounts listed in the Interim Budget for a particular line item.

99.    The Debtors propose to grant to each Pre-petition Lender adequate protection of its interests in the Pre-petition Collateral on account of the Debtors' use of the Pre-petition

Collateral and any other diminution in value for any reason whatsoever, including, but not limited to, arising out of the automatic stay or the Debtors' use, sale, lease, depreciation, depletion, or disposition of the Pre-petition Collateral (each such diminution, a "Diminution in Value").

100.    As adequate protection to the Pre-petition Lenders for the aggregate Diminution in Value, the Debtors propose to grant to the Pre-petition Lenders (effective upon the Petition Date and without the necessity of the execution or filing by the Debtors or the Pre-petition Lenders of mortgages, security agreements, pledge agreements, financing statement, or otherwise), the following:

(i)   Adequate Protection Liens: To the extent of any Diminution of Value, valid and perfected additional and replacement security interests in, and liens (the "Adequate Protection Liens") upon all of the Debtors' right, title and interest in, to, and under (i) all assets in which the respective Pre-petition Lenders held validly perfected liens as of the Petition Date; and (ii) all of the Debtors' now owned and after-acquired real and personal property, assets and rights, of any kind or nature, wherever located, including, without limitation, contracts, property, plant, equipment, general intangibles, documents, instruments, interests in leaseholds, patents, copyrights, trademarks, trade names, and all other intellectual property, capital stock of subsidiaries, cash, and cash collateral of the Debtors (whether maintained with the Pre-petition Lenders or other financial institutions), any investment of such cash and cash collateral, inventory, accounts receivable, any cause of action (excluding avoidance or other actions arising under chapter 5 of the Bankruptcy Code), and the proceeds thereof (whether recovered by judgment, settlement or otherwise, but not including causes of action brought against the Pre-petition Lenders), any right to payment whether arising before or after the Petition Date, and the proceeds, products, rents and profits of all of the foregoing (collectively, the "Adequate Protection Collateral").

(ii)   Superpriority Claims: Only to the extent that Adequate Protection Liens are not sufficient to provide adequate protection as of the Petition Date, an allowed superpriority administrative expense claim as provided and to the full extent allowed by Bankruptcy Code sections 503(b) and 507(b) and otherwise (the "Superpriority Claims").

- The Superpriority Claims shall, subject to the Carve-Out[23], be allowed claims against each Debtor (jointly and severally) with priority: (i) over any and all administrative expenses and all other claims against the Debtors, now existing or hereafter arising, of any kind, whatsoever, including without limitation, all other administrative expenses of the kind specified in Bankruptcy Code sections 503(b) and 507(b), and (ii) over any and all other administrative expenses or other claims arising under any provision of the Bankruptcy Code, including, without limitation, Bankruptcy Code sections 105, 326, 328, 330, 331, 503(b), 507(a), 507(b), or 1114, whether or not such expenses or claims may

---

[23] The term "Carve-Out" shall mean (i) quarterly fees required to be paid pursuant to 28 U.S.C. § 1930(a)(6) and any fees payable to the Clerk of the Bankruptcy Court (the "Statutory Fees"); (ii) (a) the unpaid fees and expenses of the professionals engaged by the Debtors or any Committee, if appointed, prior to a Termination Event (as defined in the Interim Order) (as accrued and regardless of whether approved and unpaid or pending approval by the Bankruptcy Court), and (b) after a Termination Event, the payment of fees and expenses of the professionals engaged by the Debtors or any Committee, if appointed (as accrued and regardless of whether approved and unpaid or pending approval by the Bankruptcy Court) that are ultimately allowed by the Bankruptcy Court pursuant to Bankruptcy Code section 330, in an aggregate amount not to exceed $100,000; and (iii) the Break-up Fee and Expense Reimbursement to the extent payable under the purchase and sale agreement between the Debtors and PGP Gas Supply Pool No. 3 LLC.

become secured by a judgment lien or other non-consensual lien, levy, or attachment.

- The Superpriority Claims shall be payable from and have recourse to all pre-petition and post-petition property of the Debtors. Other than the Carve-out, no cost or expense of administration under Bankruptcy Code sections 105, 503, or 507 or otherwise, including any such costs or expense resulting from or arising after the conversion of any of these cases under Bankruptcy Code section 1112, shall be senior to, or *pari passu* with, the Superpriority Claims granted hereunder.

- If PGP Gas Supply Pool No. 3 LLC, as proposed purchaser (the "Proposed Purchaser") under the purchase and sale agreement between the Debtors and the PGP Gas Supply Pool No. 3 LLC (the "PSA"), becomes entitled to receive the Break-up Fee and the Expense Reimbursement (both as defined in the PSA) in accordance with the terms of the PSA, which right survives the termination of the PSA, then the Proposed Purchaser shall be granted an allowed administrative claim in the Debtors' chapter 11 cases in an amount equal to the Break-up Fee and the Expense Reimbursement pursuant to Bankruptcy Code sections 503(b) and 507(a)(2). The Break-up Fee and Expense Reimbursement obligations of the Debtors, to the extent same are required to be paid and are paid, shall be subject to a carve-out from any liens, security interests or superpriority administrative expense claims granted hereunder.

(iii) <u>Payment of Fees and Expenses</u>: As additional adequate protection, the Debtors will, within 20 days of submission of invoices therefore (which invoices shall be delivered to the Debtors, the United States Trustee, and any statutory committee, which shall contain a summary description of services rendered and listing of hours and services by each professional for the time period covered thereby), to pay all reasonable fees and expenses for the professionals of the Pre-petition Lenders and the Pre-petition Agent, in each case, in connection with matters relating to the subject of these Cases. None of the fees or expenses payable pursuant to this paragraph shall be subject to separate approval by this Court (but this Court shall resolve any dispute as to the reasonableness of any such fees and expenses), and no recipient of any such payment shall be required to file any interim or final fee application with respect thereto.

(iv) <u>Investigation of Perfection of Pre-petition Liens</u>: The Carve-Out shall not include, and Cash Collateral shall not be used for, the payment or reimbursement of any fees or disbursements of the Debtors' professionals (or any professionals of any Committee, if appointed), or any trustee appointed in these chapter 11 cases, incurred in connection with the, assertion and prosecution of, or joinder in, any claim, counterclaim, action, proceeding, application, motion, objection, defenses or other contested matter, the purpose of which is to seek any order, judgment,

determination or similar relief: (i) commencing or prosecuting any action asserting claims pursuant to Bankruptcy Code sections 542, 544, 545, 547, 548, 549, 550, 551, 553(b) or 724(a) or other cause of action (whether arising under state law, the Bankruptcy Code or other federal law) against the Pre-petition Lenders with respect to the validity and extent of the obligations hereunder or the obligations under the Pre-petition Indebtedness Documents, or the validity, extent and priority of the liens and security interests securing the obligations hereunder or the obligations under the Pre-petition Indebtedness Documents; (ii) invalidating, setting aside, avoiding or subordinating, in whole or in part, the Pre-petition Lenders' liens on and security interests in the post-petition collateral or Pre-petition Collateral; or (iii) preventing, hindering or delaying (whether, directly or indirectly) the Pre-petition Lenders in respect of their liens and security interests in the Adequate Protection Collateral or Pre-petition Collateral; provided, however, that during the forty-five (45) days immediately following the entry of the Interim Order, up to an aggregate of $25,000 of Cash Collateral may be used to pay professional fees and expenses incurred by any Committee to investigate the actions enumerated in this sentence.

101.    The Debtors will also provide the Pre-petition Lenders with ample information by complying with all reporting requirements and in accordance with terms and provisions of the pre-petition credit facilities. This will enable the Pre-petition Lenders to monitor their interests in the Pre-petition Collateral and the Cash Collateral.

**J.    Debtors' Motion Pursuant to Bankruptcy Code Sections 105(a) and 363(b) and Bankruptcy Rules 6003 and 6004 for Authorization to Pay Pre-petition Lienholder Claims**

102.    In the ordinary course of business, the Debtors utilize the services of certain third parties who can assert liens against the Debtors and their property if the Debtors fail to pay for the goods or services rendered (collectively, the "Lienholders"). The Lienholders perform various services for the Debtors, including construction, repair, and maintenance work on the Debtors' equipment and facilities. Although the Debtors' employees can perform certain routine tasks in-house, such employees often lack the requisite skills and experience to perform the repairs and modifications necessary to keep the Debtors' operations running. As of September 30, 2009, the Debtors estimate that claims owed to the Lienholders are not more than $345,000.

103.     The Debtors request authority to pay undisputed pre-petition claims of certain Lienholders (the "Lienholder Claims"). In addition, because the Debtors satisfy their obligations to the Lienholders from disbursement accounts at the Banks, the Debtors request that the Court authorize the Banks to receive, honor, process, and pay any and all checks drawn, or electronic fund transfers requested or to be requested, on the Debtors' accounts to the extent that such checks or electronic fund transfers relate to any Lienholder Claims.

**K.     Debtors' Motion Pursuant to Bankruptcy Rules 1007(c) and 2002(d) for an Extension of Time to File Schedules of Assets and Liabilities, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs**

104.     Due to the complexity and diversity of their operations, the Debtors anticipate that they will be unable to complete their Schedules in the fifteen (15) days provided under Bankruptcy Code section 521 and Bankruptcy Rule 1007. To prepare their Schedules, the Debtors must compile information from books, records, and documents relating to numerous claims, assets, and contracts. This information is voluminous and is located in multiple places throughout the Debtors' organization. Collecting the necessary information requires the Debtors to expend an enormous amount of time and effort. This task is further complicated by the fact that there are several Debtor entities involved in these chapter 11 cases and the Debtors' employees will have to compile their Schedules from the records of each of the Debtors in these chapter 11 cases.

105.     While the Debtors are working diligently and expeditiously to prepare the Schedules, the Debtors' resources are limited. In view of the amount of work entailed in completing the Schedules and the competing demands upon the Debtors' employees and professionals to assist in efforts to stabilize business operations during the initial post-petition period, the Debtors will not be able to properly and accurately complete the Schedules within the required fifteen-day time period.

106.    At present, the Debtors anticipate that they will require at least thirty (30) additional days to complete their Schedules.  The Debtors submit that the vast amount of information the Debtors must assemble and compile, the multiple places where the information is located, and the number of employee and professional hours required to complete the Schedules all constitute good and sufficient cause for granting the required extension of time.

**L.     Debtors' Motion for Entry of an Order Authorizing the Debtors to File a Consolidated Creditor Matrix**

107.    Because many creditors are shared among the Debtors, the Debtors request authority to file a single, consolidated matrix of their general unsecured creditors.  Requiring each of the Debtors to file a separate creditor matrix in each of their respective cases would be unduly burdensome and would consume an excessive amount of the Debtors' scarce time and resources.  Therefore, it is in the best interest of the Debtors' estates to avoid the cost and risks associated with preparing and filing separate matrices.  Accordingly, the Debtors submit that authority to file a single, consolidated creditor matrix in these cases is in the best interests of the estate and will facilitate the efficient and orderly administration of these cases.

**M.     Notice of Designation as Complex Chapter 11 Case**

108.    The Debtors believe that their cases qualify as complex chapter 11 cases because: (a) the Debtors have total debt of more than $10 million; and (b) there are more than fifty (50) parties in interest in these cases.

**N.     Motion Pursuant to Bankruptcy Code Sections 105(a) and 1107(a) for Order Authorizing Debtors to Honor Pre-petition Claims of Pump Operators (Critical Vendors)**

109.    The Debtors seek an order authorizing them to pay the Pump Operator Obligations (as defined below) because nonpayment of such claims could jeopardize the Debtors' reorganization. Because the list (the "List") of the Pump Operators (as defined below) and the amount of their claims contains sensitive commercial information the Debtors have

sought authority to file the List under seal pursuant to Bankruptcy Code section 107(b)(1). The Debtors have provided the List to the Court, the U.S. Trustee, and the Administrative Agent, and respectfully request that such notice be deemed sufficient to satisfy the Complex Chapter 11 Procedures regarding critical vendors.

110. As noted above, the Debtors' business consists of exploration, development, acquisition and production of natural gas, natural gas liquids and crude oil. In their day-to-day operations the Debtors rely heavily on pump operators (the "Pump Operators") to check each well daily. The Pump Operators gauge the amount of oil, gas and water that is produced each day and enter the information into the production monitoring software. The Pump Operators report any operating opportunities or problems to the production superintendents and perform well service and repairs. The Pump Operators diagnose and troubleshoot problems and potential problems with the Debtors' well or lease equipment and thus maximize the Debtors' revenue from each well. Each well must be checked daily, so even a brief time lag between the resignation of one Pump Operator and the hiring of a new Pump Operator will have a significant negative effect on the Debtors' revenues. More importantly, there are huge safety and environmental issues at stake. Wells are large physical plants where people can get hurt and equipment can get damaged if not monitored constantly. Also, serious environmental problems can occur. For example, if a storage tank overflows because production is not monitored by the pump operator, then there could be a spill into a watershed or it could result in a fire. Pump operators also monitor any landowner issues such as injured livestock or surface problems. Accordingly, the Pump Operators are the ultimate critical vendors. If the Pump Operators refuse to provide services to the Debtors, the Debtors may be forced to shut down until they can find and train replacement pump operators.

111.    Many of the Pump Operators have outstanding claims against the Debtors arising from pre-petition performance of services (the "Pump Operator Obligations"). The Debtors believe that it is very likely that they would lose the services of the Pump Operators and the Debtors' business would grind to a halt if the Debtors failed to honor the Pump Operator Obligations.

112.    As of the Petition Date, the Debtors estimate that they owe approximately $97,420[24] in Pump Operator Obligations. No individual Pump Operator, however, is owed more than $19,000. The Debtors believe that the cost of paying the Pump Operator Obligations is outweighed by the significant harm that would ensue if the Debtors lost the services of the Pump Operators.

113.    Payment of the Pump Operator Obligations at this early stage in these chapter 11 cases is warranted because the harm to the estates that may result from nonpayment of such claims will most likely exceed the amount of such claims by a significant margin. The Debtors would most likely be forced to shut down operations without the Pump Operators, which in turn would eviscerate the Debtors' going concern value.

114.    The Debtors will use their best efforts to condition payments to the Pump Operators upon each Pump Operator's entry into a letter agreement with the Debtors (the "Agreement") that includes, among other things, the following terms:

- The Pump Operator will continue supplying goods throughout the chapter 11 cases on the normal and customary trade terms, practices, and programs (including, credit limits, pricing, cash discounts, timing of payments, and allowances) which were (a) most favorable to the Debtors and in effect between such vendor and the Debtors on a historical basis within 180 days of the Petition Date, (b) such other trade terms, practices or programs that

---

[24] The outstanding pre-petition amounts contained in this motion reflect the Debtors' estimate of amounts outstanding as of the Petition Date and amounts paid by check prior to the Petition Date that have not yet cleared as of the Petition Date. The Debtors reserve the right to amend the List.

are at least as favorable to the Debtors as those that were in effect before the Petition Date, or (c) such other trade terms that would be common in the industry and are acceptable to the Debtors in their business judgment (the "Customary Trade Terms") so long as the Debtors are not then in post-petition default;

- The Pump Operator acknowledges it has reviewed the applicable motion requesting and order authorizing the entering into of Agreements and agrees to be bound by such terms and provisions;

- If a Pump Operator refuses to supply products or services to the Debtor on Customary Trade Terms after receiving payment pursuant to the Order, any payments received by the Pump Operator will be deemed to have been in payment of then outstanding post-petition obligations owed to the Pump Operator and the Pump Operator will immediately repay to the Debtors any payments made to it on account of its Pump Operator Claim to the extent that the aggregate amount of such payments exceeds the post-petition obligations then outstanding (without the right of any setoffs, claims, provision for payment of reclamation or trust fund claims);

- The Pump Operator will not file or otherwise assert against the Debtors, their assets or any other person or entity (or any of their respective assets or property whether real or personal), any lien (regardless of the statute or other legal authority upon which such lien is asserted) related in any way to any remaining pre-bankruptcy amounts allegedly owed to the Pump Operator by the Debtors arising from agreements entered into prior to the Petition Date and will take the necessary steps to remove any lien obtained prior to the Vendor Agreement as soon as possible;

- The Pump Operator will not separately assert or otherwise seek payment of any reclamation claims; and

- To the extent there exist any safe-harbor contracts between the Debtors and the Pump Operator that contain a right of termination based on the Debtors' bankruptcy, insolvency, or other similar conditions, the Pump Operator will waive the filing of bankruptcy by or the insolvency or other similar conditions of the Debtors as a termination right under those contracts for the duration of the Vendor Agreement. All other default, suspension and termination provisions in such contracts shall remain in effect.

The Agreement will be retained by the Debtors and available for review by parties in interest.

**O.    Debtors' Motion for an Order Authorizing the Debtors to Pay or Honor Pre-petition and Post-petition Royalty Obligations, Working Interest Obligations and Other Obligations Under Oil and Gas Leases**

115.    In connection with the Debtors' oil and gas assets, the Debtors are obligated, pursuant to their oil and gas leases and related operating agreements, to remit to the lessors of the oil and gas leases and potentially other parties (the "Royalty Interest Owners") their share of production from the producing wells located on the respective leases, free of expenses of production (the "Royalties") and to the owners of the overriding royalty interests (the "ORRI Owners") the overriding royalties (the "ORRI"). As of the Petition Date, the Debtors estimate that they owe approximately $2.7 million to the Royalty Interest Owners and ORRI Owners for royalty obligations.

116.    The Debtors are also the operators for a number of the oil and gas wells in which the Debtors hold an interest, many under joint operating agreements with other parties. As a part of insuring that these wells continue operating, the Debtors are incurring numerous current lease operating expenses (the "LOEs"). Many of the invoices for the LOEs will cover both pre-petition and post-petition expenses. Given the number of such invoices, and the Debtors' limited accounting staff, separating the pre-petition portions from the post-petition portions of each individual invoice will be impractical or even impossible for the Debtors to timely accomplish. Therefore, the Debtors request authority to continue to satisfy these LOE obligations as they arise in the ordinary course of business.

117.    Where the Debtors hold non-operating working interests in wells under various joint operating agreements ("JOAs"), the Debtors receive payments representing their share of production revenues. The Debtors then reimburse the operator for their share of the production costs through the payment of joint-interest billings ("JIBs," and together with the Royalties, the ORRI, the LOEs, and the obligations under the JOAs, the "Obligations"). The failure to timely

pay JIBs may provide grounds for the operator to assert contractual or statutory lien rights against the Debtors' interest in a well and the underlying oil and gas lease. Therefore, the Debtors request authority to continue to satisfy these JIBs as they arise in the ordinary course of business.

118.    Non-payment of the Royalties and ORRI could jeopardize the oil and gas leases. Royalty Interest Owners and ORRI Owners are paid in arrears and should be paid promptly. To the extent that the Debtors and any Royalty Interest Owners or ORRI Owners dispute the amount of Royalties or ORRI owed, the Debtors will segregate the funds they believe are owed pending an agreement or, if necessary, further orders of the Court resolving the dispute. Accordingly, the Debtors believe that the payment of the Royalties and ORRI is in the best interests of the Debtors and their estates.

119.    If the Debtors fail to satisfy the LOE, JOA and JIB obligations as they become due, the Debtors' operations will be severely impacted and production may completely cease for certain wells. These occurrences would directly, immediately and negatively impact the Debtors' creditors and other parties in interest. Accordingly, the Debtors believe that satisfaction of the obligations related to the LOEs, JOAs and JIBs as they become due is in the best interests of the Debtors and their estates.

120.    Further, if the Debtors do not continue to pay the obligations related to the Royalties, ORRI, LOEs, JOAs and JIBs as they are received, it may give rise to numerous statutory liens, which would burden the Debtors' assets and could diminish the value of those assets to potential purchasers. For example, Article 9.343 of the Texas Business and Commerce Code (Uniform Commercial Code) provides a security interest in favor of interest owners, as secured parties, to secure the obligations of the first purchaser of oil and gas production, as

debtor, to pay the purchase price. Additionally, under applicable law, certain parties may assert claims for costs and/or attorneys fees incurred in prosecuting their liens. If the Debtors are unable to pay these expenses, as requested herein, there may be numerous administrative costs incurred by the Debtors' estates as well as lien claims on the production and underlying oil and gas interests. The ongoing and regular payment of these expenses will protect the Debtors' assets and will obtain the greatest possible value for the Debtors' creditors and other parties in interest.

121.    In the instances where the Debtors hold a non-operating working interest in their leases, the JOAs often grant the operator a contractual lien upon the Debtors' interest in a well and the underlying lease that may include (a) all equipment installed on the lease; (b) all hydrocarbons or other minerals severed and extracted from or attributable to the lease; (c) all accounts and proceeds of sale, contract rights, and general intangibles arising in connection with the sale; (d) fixtures; and (e) any and all accessions, additions and attachments thereto and the proceeds and products therefrom. The lien sometimes purports to secure the payment of all charges, fees, court costs, and other directly related collection costs. If the Debtors do not pay charges when due, the operator may also attempt to assert additional rights to collect from the purchaser of the Debtors' hydrocarbon production until the amount owed has been paid. The Debtors expect to pay, and should have the funds available to pay, the Obligations in the ordinary course of business post-petition.

122.    Satisfaction of the LOE, JOA and JIB obligations at this early stage in these chapter 11 cases is warranted because the harm to the estates that may result from nonpayment of such claims will most likely exceed the amount of such claims by a significant margin. The Debtors' ongoing operations depend, to a significant degree, on its relationship with the parties

to whom LOE, JOA and JIB obligations are owed.  If these relationships are harmed, either through the non-payment of obligations as they become due, or through the perceived difficulties of dealing with chapter 11 debtors, the Debtors will likely encounter particularized controversies with each entity, unnecessary costs and distractions and corresponding harm to their businesses with the possible loss of the Debtors' going concern value.  Given the competitive nature of the Debtors' businesses, the strict lease provisions, and statutes, the counterparties to LOEs and JIBs may not have the same dependence upon the Debtors.

123.    As such, the Debtors' failure to timely pay JIBs owing is likely to lead to instances of attempted setoff or recoupment.  To ensure that they have sufficient funds to operate their businesses under the terms of the proposed cash collateral budget and proposed debtor in possession financing, the Debtors request the authority, but not the direction, to pay all pre-petition and post-petition JIBs when due in the ordinary course.

**P.     Debtors' Motion Pursuant to Bankruptcy Code Section 107(b)(1) for Order Authorizing the Filing of Critical Vendor List Under Seal**

124.    The Debtors respectfully request entry of an order pursuant to Bankruptcy Code section 107(b)(1) and Bankruptcy Rule 9018 authorizing the Debtors to file under seal the exhibits to the Critical Vendor Motions (the "Critical Vendor Exhibits") and authorizing the Clerk of the Court to release copies of the Critical Vendor Exhibits to the Court, the Debtors, the U.S. Trustee, the Pre-petition Lenders, and any statutory committee(s) appointed in these cases upon such parties' request.

125.    Sealing the Critical Vendor Exhibits will prevent a potential chilling effect on negotiations with critical vendors.  Vendors that know they have been identified as "critical" may attempt to extract early payment from the Debtors.  Sealing the Critical Vendor Exhibits will allow the Debtors to quickly respond to critical vendors without signaling that early

payments and other concessions are warranted, and will place the Debtors in a better bargaining position with respect to the critical vendors.

**Q.  Debtors' Motion for (A) Entry of an Order (I) Approving Bidding Procedures in Connection with the Sale of the Debtors' Property, (II) Scheduling Bidding Deadline, Auction Date and Sale Hearing Date, (III) Approving Form and Notice Thereof, and (B) Entry of an Order After the Sale Hearing (I) Authorizing the Debtors to Sell Their Property, (II) Authorizing the Debtors to Assume and Assign Certain Executory Contracts and Unexpired Leases and (III) Granting Related Relief**

126.    The Debtors seek (a) entry of an order (the "Bid Procedures Order") (i) approving bidding procedures (the "Bidding Procedures") in connection with the sale of the Debtors' property or equity interests in the Debtors to be issued pursuant to the Plan, (ii) scheduling bidding deadline, auction date and sale hearing date, and (iii) approving form and notice thereof. The Debtors submit that the Bidding Procedures will permit interested parties reasonable opportunities, consistent with the Debtors' financial constraints, to evaluate whether to propose a bid for the Debtors' property or equity interests in the Debtors that is higher and better than that contained in the Purchase Agreement between the Debtors and the Buyer.

127.    The Bidding Procedures are designed to maximize value for the Debtors' estates and ensure that a marketing and sales process is undertaken by the Debtors in accordance with the timeline required by the Buyer. The Bidding Procedures are the result of good faith arm's-length negotiations between the Debtors and the Buyer. To preserve the Debtors' going-concern value, the Debtors wish to proceed with the transactions contemplated by the Purchase Agreement as expeditiously as possible..

128.    The Bidding Procedures proposed herein are designed to maximize the value received for the Debtors' assets being sold under the Purchase Agreement (the "Acquired Property") by facilitating a competitive bidding process in which all potential bidders are encouraged to participate and submit competing bids, taking into account the financial

exigencies facing the Debtors. The Bidding Procedures provide potential bidders with more than the twenty day notice envisioned by Bankruptcy Rule 2002, which provides sufficient notice and opportunity to acquire the information necessary to submit a timely and informed bid. The liquidity crisis facing the Debtors precludes a more extended process, and the Debtors believe that the period between the Petition Date and the deadline for submission of bids provides a reasonable means for maximizing the return from sale of the Acquired Property within the financial constraints faced. This conclusion is supported by the fact that pre-petition, the Debtors and their professionals aggressively marketed the assets, properties and equity of the Debtors.

129.    At the same time, the Bidding Procedures provide the Debtors with the opportunity to consider all competing offers and to select the highest or best offer for the completion of the sale. Entering into the Purchase Agreement with the Buyer ensures fair value by setting a minimum purchase price that is acceptable to both the Debtors' Pre-petition Lenders and the Debtors and exposing such bid to testing by the marketplace. Accordingly, the Debtors and all parties in interest can be assured that, taking into account the financial condition of the Debtors, the consideration paid for the Acquired Property will be fair, reasonable, and in the best interest of the Debtors' estates and creditors, and there are sound business reasons to approve the Bidding Procedures.

130.    As stated above, the Debtors have aggressively marketed their assets, properties and equity interests. Although the Debtors have determined, in their reasonable business judgment, that the sale of the Acquired Property should be subject to auction, the Debtors' ability to maximize value to their estate and creditors through such auction may be impaired absent the Buyer and the minimum sale value for the Acquired Property established by the Purchase

Agreement. As a result, the Debtors request authority to pay the Buyer a break-up fee and expense reimbursement if the conditions set forth in the Purchase Agreement are satisfied.

**R.     Request for Emergency Consideration of Certain "First Day" Matters**

131.    Counsel for the Debtors believes the Debtors' cases qualify as "Complex Chapter 11 Cases." As such, the Debtors need emergency consideration of the following initial case matters (collectively the "First Day Matters"):

(1)    Debtors' Motion Pursuant to Bankruptcy Rule 1015 Requesting Joint Administration of Chapter 11 Cases;

(2)    Debtors' Motion for Entry of an Order Authorizing the Debtors to File a Consolidated Creditor Matrix;

(3)    Debtors' Motion Pursuant to Bankruptcy Rules 1007(c) and 2002(d) for an Extension of Time to File Schedules of Assets and Liabilities, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs

(4)    Debtors' Motion Pursuant to Bankruptcy Code Sections 363(b) and 507(a) for an Order (I) Authorizing Payment of Wages, Compensation, Benefits, and Other Employee Obligations and (II) Authorizing Financial Institutions to Honor and Process Checks and Transfers Related to Such Obligations;

(5)    Debtors' Motion Pursuant to Bankruptcy Code Sections 105(a), 345(b), 363(b), 363(c) and 364(a) and Bankruptcy Rules 6003 and 6004 for (A) Authorization to (I) Continue Using Existing Centralized Cash Management System, as Modified, (II) Honor Certain Pre-petition Obligations Related to the Use of the Cash Management System, and (III) Maintain Existing Bank Accounts and Business Forms; and (B) for Authorization to Continue Current Investment Policies Pursuant to Bankruptcy Code Section 345(b);

(6)    Debtors' Motion Pursuant to Bankruptcy Code Sections 105(a), 363(b), and 541 for Authorization to Pay Certain Pre-petition Taxes and Licensing Fees;

(7)    Debtors' Motion Pursuant to Bankruptcy Code Sections 105(a) and 363(b) and Bankruptcy Rules 6003 and 6004 for Authorization to Pay Pre-petition Common Carrier Fees and Lienholder Fees;

(8)    Motion of the Debtors for Entry of Interim and Final Orders Determining Adequate Assurance of Payment For Future Utility Services;

(9)    Motion of the Debtors for Entry of an Order Authorizing the Debtors to Pay Pre-petition Claims of Certain Critical Vendors and Approving Procedures Related Thereto;

(10)   Notice of Designation as Complex Chapter 11 Case;

(11)   Debtors' Motion for Authority to Use Cash Collateral and Grant Adequate Protection;

(12)   Motion of Debtors for Order Under 28 U.S.C. § 156(c) and Bankruptcy Rule 2002(f) Approving Agreement With Kurtzman Carson Consultants LLC and Appointing Kurtzman Carson Consultants LLC as Claims, Noticing, Soliciting and Balloting Agent;

(13)   Motion Pursuant to Bankruptcy Code Sections 105(a) and 1107(a) for Order Authorizing Debtors to Honor Pre-petition Claims of Pump Operators (Critical Vendors);

(14)   Debtors' Motion for an Order Authorizing the Debtors to Pay or Honor Pre-petition and Post-petition Royalty Obligations and Other Obligations Under Oil and Gas Leases;

(15)   Debtors' Motion Pursuant to Bankruptcy Code Section 107(b)(1) for Order Authorizing the Filing of Critical Vendor List Under Seal; and

(16)   Debtors' Motion for (a) Entry of an Order (i) Approving Bidding Procedures in Connection with the Sale of the Debtors' Property, (ii) Scheduling Bidding Deadline, Auction Date and Sale Hearing Date, (iii) Approving Form and Notice Thereof, and (b) Entry of an Order After the Sale Hearing (i) Authorizing the Debtors to Sell Their Property, (ii) Authorizing the Debtors to Assume and Assign Certain Executory Contracts and Unexpired Leases and (iii) Granting Related Relief.

Dated: 10/1/09

_____
Gary Pittman


STATE OF TEXAS          §
                        §
COUNTY OF HOUSTON       §

SUBSCRIBED TO AND SWORN TO BEFORE ME this 1st day of October, 2009.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
Notary Public in and for the State of Texas

[S E A L]

ADA F. DAVIS
Notary Public, State of Texas
My Commission Expires
January 31, 2010

# EXHIBIT A

**PRIVILEGED AND CONFIDENTIAL**
**PROVIDED AS PART OF SETTLEMENT DISCUSSIONS**
**SUBJECT TO RULE 408 OF THE FEDERAL RULES OF EVIDENCE**
**AND ALL BANKRUPTCY AND STATE LAW EQUIVALENTS**

## PLAN SUPPORT AND LOCK-UP AGREEMENT REGARDING
## EDGE PETROLEUM CORPORATION

This Plan Support and Lock-up Agreement (this "Agreement") dated as of September 30, 2009 (the "Agreement Effective Date") is among Edge Petroleum Corporation, a Delaware corporation ("Borrower"), each of the Borrower's Subsidiaries (as defined below), and the Lenders (as defined below) executing this Agreement (collectively, the "Supporting Lenders").

### RECITALS

A.     The Borrower is a party to that certain Fourth Amended and Restated Credit Agreement dated as of January 31, 2007 among the Borrower, the financial institutions party thereto from time to time (the "Lenders"), and Union Bank, N.A. (f/k/a Union Bank of California, N.A.)("Union") as administrative agent for the Lenders (in such capacity the "Administrative Agent") and as issuing lender (in such capacity, the "Issuing Lender"), as amended by the Amendment No. 1 dated as of July 11, 2007, the Amendment No. 2 dated as of December 10, 2007, the Amendment No. 3 and Agreement dated as of May 8, 2008, the Consent and Amendment No. 4 dated as of March 16, 2009, the Amendment No. 5 dated as of May 15, 2009, the Amendment No. 6 dated as of May 29, 2009, the Amendment No. 7 dated as of June 30, 2009, the Amendment No. 8 dated as of July 31, 2009 and the Amendment No. 9 dated as of August 31, 2009 (as so amended and as the same may be further amended, modified or supplemented from time to time, the "Credit Agreement"). Unless otherwise defined in this Agreement, each term used in this Agreement that is defined in the Credit Agreement has the meaning assigned to such term in the Credit Agreement; provided, however, that unless otherwise defined in this Agreement, the capitalized words appearing, but not otherwise defined, in Section 2(b)(ii) shall have the meaning given to them in the Purchase Agreement (as defined below) and the capitalized words appearing, but not otherwise defined, in Section 2(b)(iii) shall have the meaning given to them in the Conforming Plan (as defined below). The Supporting Lenders represent holders of at least two-thirds of the outstanding Obligations under the Credit Agreement and more than one-half in number of the Lenders.

B.     Borrower and its direct and indirect subsidiaries, including Edge Petroleum Exploration Company, a Delaware corporation; Miller Exploration Company, a Delaware corporation; Edge Petroleum Operating Company, Inc., a Delaware corporation; Edge Petroleum Production Company, a Delaware corporation; and Miller Oil Corporation, a Michigan corporation (collectively, the "Subsidiaries" and each a "Subsidiary"), desire to implement a restructuring and reorganization of Borrower and its Subsidiaries such that the Lenders and the other holders of claims against and/or equity interests in Borrower and its Subsidiaries shall

receive the consideration to be paid, distributed or provided by the Borrower and its Subsidiaries pursuant to such restructuring and reorganization as set forth in a plan of reorganization conforming in all material respects to the plan attached hereto as Exhibit A (the "Conforming Plan").

C.      In order to expedite the contemplated restructuring and reorganization of Borrower and its Subsidiaries, each party hereto desires to pursue and support the Conforming Plan by way of the Borrower and each of the Subsidiaries each commencing a voluntary case (collectively, the "Bankruptcy Cases") pursuant to Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of Texas, Corpus Christi Division (the "Bankruptcy Court"). Upon commencing such cases, the Borrower shall cause to be filed a motion (the "Sale Motion") to establish bidding procedures to effect the sale of all or substantially all of its assets to the bidder who submits the highest and best offer. Together the Sale Motion and the Plan will seek to achieve and implement that certain Purchase and Sale Agreement (the "Purchase Agreement") dated September 30, 2009 with PGP Gas Supply Pool No. 3, LLC, a Georgia limited liability company (the "Buyer") attached hereto as Exhibit B, subject to a higher and better offer solicited, selected and approved as the winning bid in accordance with the Bidding Procedures Order (as defined in the Purchase Agreement) (the purchase and sale or similar agreement effecting the purchase and sale of the equity interests or assets of the Borrower and its Subsidiaries, whether the Purchase Agreement or a higher and better agreement entered into pursuant to the Bidding Procedures Order, being referred to herein as the "Final Agreement," and any such restructuring transaction effected thereby a "Restructuring Transaction").

D.      In order to implement the Restructuring Transaction, the Borrower and its Subsidiaries have agreed, subject to the terms of this Agreement, (i) to prepare and file (a) a Conforming Plan, (b) a disclosure statement that conforms in all material respects with the disclosure statement attached hereto as Exhibit C (the "Conforming Disclosure Statement") and (ii) to use reasonable commercial efforts to have the Conforming Disclosure Statement approved and the Conforming Plan confirmed by the Bankruptcy Court.

## STATEMENT OF AGREEMENT

In consideration of the premises and mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, agree as follows:

## Section 1.  Support of Final Agreement, Filing of Bankruptcy Cases and Related Transactions.

(a)      Each Supporting Lender agrees that until this Agreement is terminated (or the obligations of the Supporting Lenders set forth in Section 1 of this Agreement (the "Support Obligations") terminate as provided herein), it (i) shall vote (or cause the voting of ) its claim(s) to accept the Conforming Plan following receipt of the Conforming Disclosure Statement and any solicitation of votes for the Conforming Plan, no later than any voting deadline stated therein, (ii) shall vote against and shall in no way otherwise, directly or indirectly, support any

restructuring or reorganization of the Borrower and its Subsidiaries (or any plan or proposal in respect of the same) that is not consistent with, or does not implement or achieve the Conforming Plan and the Final Agreement and (iii) shall not (A) directly or indirectly seek, solicit, support or encourage any other plan or the termination of the exclusive period for the filing of any plan, proposal or offer of dissolution, winding up, liquidation, reorganization, merger or restructuring of the Borrower and/or its Subsidiaries except as contemplated in the Conforming Plan, (B) object to the Conforming Disclosure Statement or the solicitation of votes for the Conforming Plan or support any such objection by any third party or (C) take any other action that is inconsistent with, or that would materially delay or obstruct the proposed solicitation, confirmation or consummation of, the Conforming Plan. Nothing contained herein shall limit the ability of any Supporting Lender, the Issuing Lender or the Administrative Agent to consult with the Borrower, or to appear and be heard, concerning any matter arising in the Bankruptcy Cases so long as such consultation or appearance does not violate the Supporting Lenders' obligations under the terms of this Agreement. Notwithstanding the foregoing or any other provision of this Agreement, the Conforming Plan, the Bidding Procedures Order and the cash collateral order to be entered by the court in the Bankruptcy Cases have set forth or will describe a number of rights of the Administrative Agent, the Issuing Lender, or the Supporting Lenders, and the exercise of any of such rights, including, without limitation, an objection or a refusal to consent or approve or similar action, is hereby expressly permitted by, and will not be or be deemed to be a violation or breach of, this Agreement. The Supporting Lenders, Issuing Lender and Administrative Agent may also exercise their other rights as creditors and parties of interest in the Bankruptcy Cases as long as the exercise of those rights do not violate the Support Obligations.

(b)     The Borrower and its Subsidiaries agree that they will (i) use reasonable commercial efforts to (A) file the Bankruptcy Cases with respect to the Restructuring Transaction in the United States Bankruptcy Court for the Southern District of Texas, Corpus Christi Division, on or prior to October 1, 2009 (the "Filing Date"), (B) obtain Bankruptcy Court approval of a cash collateral order and budget that are, in each case, in form and substance acceptable to the Supporting Lenders, (C) file the Conforming Plan and Conforming Disclosure Statement with the Bankruptcy Court within five (5) days of the Filing Date, (D) obtain Bankruptcy Court approval of the Conforming Disclosure Statement within forty-five (45) days of the Filing Date, (E) obtain confirmation of the Conforming Plan by the Bankruptcy Court within ninety (90) days of the Filing Date, and (F) consummate the Final Agreement within eleven (11) days of confirmation of the Conforming Plan, and not to take any action that is materially inconsistent with, or that would materially delay consummation of, either the Restructuring Transaction or the effectiveness of the Conforming Plan; and (ii) not assert or support any assertion by any third party that, in order to act on the provisions of Section 2(b), the Supporting Lenders shall be required to obtain relief from the automatic stay from the Bankruptcy Court (and hereby waives, to the greatest extent possible, the applicability of the automatic stay to the giving of such notice).

### Section 2. Termination of Support Obligations.

(a)     The Support Obligations shall be subject to termination upon the occurrence of any Support Termination Event.

(b)     A "Support Termination Event" shall mean any of the following:

(i)     the Chapter 11 Cases to implement the Restructuring Transaction through confirmation of the Conforming Plan shall not have been commenced by October 5, 2009;

(ii)     the sum of the following (the "Proposed Adjustment Amount") exceeds $5,000,000: (A) the aggregate Defect Values asserted by Buyer in all Title Defect Notices, plus (B) the aggregate Buyer Remediation Amount asserted by Buyer in all Adverse Environmental Condition Notices, plus (C) the sum of the Allocated Values of all Retained Properties plus (D) the sum of all Casualty Losses (to the extent not covered by insurance or condemnation awards);

(iii)     the sum of the following (the "Allowed Administrative and Priority Claims Amount") exceeds the Administrative and Priority Claims Reserve: (A) the Allowed Administrative Claims, (B) the Allowed Priority Tax Claims, (C) the Allowed Priority Non-Tax Claims and (D) the Allowed Other Secured Claims;

(iv)     the Borrower and its Subsidiaries (A) shall file with the Bankruptcy Court any plan of reorganization or liquidation other than the Conforming Plan or (B) shall modify or amend the Conforming Plan in any material respect without the written consent of the Required Lenders (as defined in the Credit Agreement) or (C) shall modify or amend the Purchase Agreement or any of its Exhibits or Schedules in any material respect or waive any material right thereunder without the written consent of the Required Lenders;

(v)     the Bankruptcy Court shall enter a cash collateral order or budget that is, without the written consent of the Required Lenders, materially different from those agreed upon by the Supporting Lenders, the Borrower and its Subsidiaries as described in Section 3(e);

(vi)     the Conforming Plan shall not have been confirmed by the Bankruptcy Court in accordance with its terms within one hundred and five (105) days of the Filing Date;

(vii)     (A) the Borrower shall withdraw or revoke the Conforming Plan or (B) the Borrower shall publicly announce its intention not to pursue confirmation of the Conforming Plan;

(viii)     (A) a trustee shall have been appointed in any of the Chapter 11 Cases, (B) any of the Chapter 11 Cases shall have been converted to cases under Chapter 7 of the Bankruptcy Code, or (C) any of the Chapter 11 Cases shall have been dismissed by order of the Bankruptcy Court; or

(ix)     the Conforming Plan shall not have been substantially consummated in accordance with its terms within one hundred twenty (120) days of the Filing Date.

(c)     The Borrower shall promptly notify the Supporting Lenders and the Buyer of the occurrence of any Support Termination Event.

(d)     Upon the occurrence of a Support Termination Event (other than a Support Termination Event described in Section 2(b)(ii) or Section 2(b)(iii)), the Support Obligations of the Supporting Lenders shall terminate. In the case of a Support Termination Event described in Section 2(b)(ii) or 2(b)(iii), such termination shall not be effective until 5:00 p.m. on the fifth (5th) business day following written notice by any Supporting Lender to the Borrower and the Buyer (the "Termination Time"). In the event of a termination pursuant to Section 2(b)(ii) or 2(b)(iii), any such termination shall not be effective if Buyer delivers a written notice to the Supporting Lenders and the Borrower prior to the Termination Time, which notice includes a binding commitment of Buyer to the Supporting Lenders and the Borrower to increase the Purchase Price (as defined in the Purchase Agreement) by an amount equal to the sum of (i) the amount, if any, by which the Proposed Adjustment Amount exceeds $5,000,000 and (ii) the amount, if any, by which the Allowed Administrative and Priority Claims Amount exceeds the Administrative and Priority Claims Reserve. Following the termination of the Support Obligations, each party shall have all rights and remedies available to it under applicable law, the Credit Agreement, and any ancillary documents or agreements thereto. If the Support Obligations have been terminated in accordance with the terms herein, and such termination was not as the direct result of a breach of the Support Obligations by the Supporting Lenders, the Issuing Lender or the Administrative Agent, at any time when permission of the Bankruptcy Court may be required for a Supporting Lender, the Issuing Lender or the Administrative Agent to change or withdraw (or cause to change or withdraw) its vote to accept the Conforming Plan, the Borrower and its Subsidiaries shall not oppose any attempt by a Supporting Lender, the Issuing Lender or Administrative Agent to change or withdraw (or cause to change or withdraw) such vote at such time. No Lender, Issuing Lender nor Administrative Agent shall have any liability to the Borrower or its Subsidiaries, the Buyer, or any other Person in respect of any termination of the Support Obligations in accordance with the terms hereof.

**Section 3. Conditions to Effectiveness.** This Agreement shall become effective on the Agreement Effective Date and enforceable against the parties hereto upon the occurrence of the following conditions precedent:

(a)     The Administrative Agent shall have received multiple original counterparts, as requested by the Administrative Agent, of this Agreement duly and validly executed and delivered by duly authorized officers of the Supporting Lenders (representing at least two-thirds in amount of the outstanding Obligations under the Credit Agreement and more than one-half in number of the Lenders), the Borrower and each of the Subsidiaries.

(b)     After giving effect to this Agreement, no Support Termination Event shall have occurred and be continuing as of the Agreement Effective Date.

(c)     The representations and warranties in this Agreement shall be true and correct in all material respects.

(d)     The Borrower shall have paid all costs and expenses which have been invoiced and are payable pursuant to Section 9.03 of the Credit Agreement.

(e)     The Supporting Lenders and the Borrower and its Subsidiaries shall have agreed upon a form of cash collateral order and budget.

**Section 4.  Good Faith Cooperation; Further Assurances.**  To the extent practicable and subject to the terms hereof, the parties hereto shall cooperate with each other in good faith and shall coordinate their activities with respect to the performance of their obligations under this Agreement, including, without limitation, those with respect to the Conforming Plan, the Final Agreement and the Restructuring Transaction.  Furthermore, subject to the terms hereof, each of the parties shall take action as may be reasonably necessary in connection with the performance of their obligations hereunder (provided that no Lender shall be required to incur any expense, liability or other obligation), and shall refrain from taking any action in violation thereof, including proposing a plan that is not a Conforming Plan or taking any other action that is inconsistent with, or that would materially delay or obstruct the proposed confirmation of, the Conforming Plan.  This Agreement is not and shall not be deemed a solicitation for consents to the Conforming Plan.

**Section 5.  Acknowledgement and Agreement.**

(a)     The Borrower acknowledges that on the date hereof all Obligations are payable without defense, offset, counterclaim or recoupment.

(b)     The Supporting Lenders hereby expressly reserve all of their rights, remedies and claims under the Loan Documents.

(c)     Each of the Borrower and the Subsidiaries does hereby adopt, ratify and confirm the Credit Agreement and acknowledges and agrees that the Credit Agreement is and remains in full force and effect, and that its liabilities and obligations under the Credit Agreement are not impaired in any respect by this Agreement.

(d)     As a condition to BNP Paribas executing this Agreement, each of the undersigned parties acknowledge and agree that the agreement of BNP Paribas to support the transactions contemplated under Section 1(a) as described herein does not waive any of the Event of Default or Termination Event rights of BNP Paribas as defined and described under the ISDA Master Agreement, dated as of August 30, 2005 between BNP Paribas and the Borrower ((including any and all supporting Confirmations and Schedules) as amended, supplemented and revised including, without limitation that certain Amendment Agreement, dated as of July 6, 2009 between BNP Paribas and Borrower, the "ISDA Master Agreement").  The Borrower and each of the Subsidiaries acknowledge and agree that upon the consummation of the transaction contemplated by the Purchase Agreement, the Final Agreement or any other transaction arising from the purchase and sale of the equity or assets of Borrower and its Subsidiaries, a Termination Event shall occur pursuant to Section 5(b)(v) of the ISDA Master Agreement, resulting in the termination of the outstanding Hedge Contracts under the ISDA Master Agreement as of the Early Termination Date which shall be the Closing Date under the Final Agreement.  For notice purposes as required by the ISDA Master Agreement, the notice of Termination Event shall be the consummation of the transaction contemplated by the Final Agreement.

HOUSTON\2320664.5

**Section 6.  Releases**.  EACH OF THE BORROWER AND ITS SUBSIDIARIES (FOR THEMSELVES AND THEIR RESPECTIVE SUCCESSORS, AGENTS, ASSIGNS, TRANSFEREES, OFFICERS, DIRECTORS, MANAGERS, EMPLOYEES, SHAREHOLDERS, ATTORNEYS AND AGENTS) HEREBY RELEASES ANY AND ALL CLAIMS, CAUSES OF ACTION OR OTHER DISPUTES IT MAY HAVE AGAINST THE ADMINISTRATIVE AGENT, ISSUING LENDER, ANY OF THE LENDERS, LEGAL COUNSEL TO THE ADMINISTRATIVE AGENT, ISSUING LENDER OR ANY OF THE LENDERS, CONSULTANTS HIRED BY ANY OF THE FOREGOING, OR ANY OF THEIR RESPECTIVE AFFILIATES, SUBSIDIARIES, SHAREHOLDERS, AGENTS, DIRECTORS, MANAGERS, OFFICERS, EMPLOYEES, REPRESENTATIVES, SUCCESSORS OR ASSIGNS OF ANY KIND OR NATURE ARISING OUT OF, RELATED TO, OR IN ANY WAY CONNECTED WITH, THE CREDIT AGREEMENT OR THE LOAN DOCUMENTS, IN EACH CASE WHICH MAY HAVE ARISEN ON OR BEFORE THE DATE OF THIS AGREEMENT.    EACH OF THE BORROWER AND ITS SUBSIDIARIES HEREBY ACKNOWLEDGES THAT IT HAS READ THIS AGREEMENT AND HAS CONFERRED WITH ITS COUNSEL AND ADVISORS REGARDING ITS CONTENT, INCLUDING THIS SECTION, AND IS FREELY AND VOLUNTARILY ENTERING INTO THIS AGREEMENT AND HEREBY AGREES TO WAIVE AND HEREBY WAIVES ANY CLAIM THAT THE TERMS OF THIS AGREEMENT (INCLUDING, WITHOUT LIMITATION, THE RELEASES CONTAINED HEREIN) ARE INVALID OR OTHEWISE UNEFORCEABLE.

**Section 7.  Representations and Warranties**.  The Borrower and its Subsidiaries and each of the Supporting Lenders represent and warrant to each other that the following statements are true, correct, and complete as of the date hereof:

(a)    the execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary corporate or other action on its part;

(b)    the execution, delivery, and performance by it of this Agreement do not and shall not (i) violate any provision of law, rule, or regulation applicable to it or its certificate of incorporation or corporate by-laws or other organizational documents, or (ii) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it is a party or under its certificate of incorporation or corporate by-laws or other organizational documents;

(c)    the execution, delivery, and performance by it of this Agreement do not and shall not require by it any registration or filing with, consent or approval of, or notice to, or other action to, with or by, any federal, state, or governmental authority or regulatory body, except such filings as may be necessary and/or required for disclosure with the Securities and Exchange Commission and in connection with the commencement of the Chapter 11 Cases, the approval of the Conforming Disclosure Statement, and confirmation of the Conforming Plan; and

(d)    this Agreement is the legally valid and binding obligation of such party, enforceable in accordance with its terms, except as enforcement may be limited by bankruptcy,

insolvency, reorganization, moratorium, or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability.

Section 8.  **Amendments and Waivers**.  Once effective, this Agreement and any material term or provision of the Conforming Plan or the Restructuring Transaction may not be modified, amended, or supplemented except in writing signed by both (i) the Borrower and (ii) each of the Supporting Lenders.

Section 9.  **No Third-Party Beneficiaries**.  Unless expressly stated herein, this Agreement shall be solely for the benefit of the parties hereto, and no other person or entity shall be a third-party beneficiary hereof.

Section 10.  **Counterparts, Facsimile Signatures**.  This Agreement may be signed in any number of counterparts, each of which shall be an original and all of which, taken together, constitute a single instrument.  This Agreement may be executed by facsimile signature and all of such signatures shall be effective as original signatures.

Section 11.  **Successors and Assigns**.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted pursuant to the Credit Agreement.  No Supporting Lender may assign its Obligations under the Credit Agreement unless it concurrently assigns to such assignee its rights and obligations under this Agreement and such assignee agrees to be bound hereby.

Section 12.  **Invalidity**.  In the event that any one or more of the provisions contained in this Agreement shall for any reason be held invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement.

Section 13.  **Governing Law**.  This Agreement shall be deemed to be a contract made under and shall be governed by and construed in accordance with the laws of the State of Texas.

Section 14.  **Entire Agreement**.  This Agreement (including the Exhibits, which are an integral part of this Agreement), the Credit Agreement, the Notes and the other Loan Documents constitute the entire understanding among the parties hereto with respect to the subject matter hereof and supersede any prior agreements, written or oral, with respect thereto.

Section 15.  **Notice**.  All notices and other communications under this Agreement shall be in writing, sent contemporaneously to all of the entities set forth below, and deemed given when sent by hand, by facsimile, or any other electronic means during standard business hours (from 8:00 a.m. to 6:00 p.m. Prevailing Eastern Time) at the place of receipt at the addresses, facsimile numbers, or e-mail addresses listed below with a copy to each of the following:

If to the Borrower or the Subsidiaries:

Gary Pitman
Edge Petroleum Corporation
1301 Travis, Suite 2000
Houston, TX 77002

HOUSTON\2320664.5

With a copy to:

Charles R. Gibbs
Akin Gump Strauss Hauer & Feld LLP
1700 Pacific Avenue, Suite 4100
Dallas, TX 75201

If to the Supporting Lenders:

Malcolm Duncan McDuffie
Union Bank, N.A.
445 S. Figueora St., Suite 403
Los Angeles, CA 90071

With a copy to:

William A. (Trey) Wood, III
Bracewell & Giuliani LLP
711 Louisiana St., Suite 2300
Houston, TX 77002

**THERE ARE NO UNWRITTEN ORAL AGREEMENTS AMONG THE PARTIES.**

[Signature Pages Follow]

EXECUTED effective as of the date first written above.

LENDER:                          **UNION BANK, N.A. (f/k/a Union Bank of California, N.A), as a Lender**

By: _____

Printed Name: **M. DUNCAN McDUFFIE**

Title: _____**Vice President**_____

SEP-30-2009  12:27       JPMORGAN CHASE BANK                    2149652699    P.02

LENDER:                          **JPMORGAN CHASE BANK, N.A., as a Lender**

By: _____

Printed Name: _____ RANDALL B. DURANT _____

Title: _____ SENIOR VICE PRESIDENT _____

HOUSTON\2320664.5

-11-

TOTAL P.02

LENDER:

**SUNTRUST BANK**, as a Lender

By: _____

Printed Name:  Katherine Bass
Title:          First Vice President

LENDER:

MIZUHO CORPORATE BANK, LTD., as a Lender

By: _____

Printed Name: <u>Noel Purcell</u>

Title: _____<u>Authorized Signatory</u>

LENDER:

THE FROST NATIONAL BANK, as a Lender

By: _____

Printed Name: _Larry O. Sprouse_

Title: _Sr. E. V. P._

LENDER:

COMPASS BANK, as a Lender

By: _____

Printed Name: _____KELLY L. ELMORE III_____

Title: _____Senior Vice President_____

**LENDER:**

**U.S. BANK NATIONAL ASSOCIATION, as a**
Lender

By: _____
Printed Name: _____ Timothy Gill _____
Title: _____ officer _____

LENDER:                              **BANK OF SCOTLAND PLC,** as a Lender

By: _____
Printed Name: Julia R Franklin
Title: Assistant Vice President

EXECUTED effective as of the date first written above.

BORROWER:                          **EDGE PETROLEUM CORPORATION,**
                                   a Delaware Corporation

                                   By: _____
                                   Name: _John W. Elias_____
                                   Title: _President & CEO_____

SUBSIDIARIES:                      **EDGE PETROLEUM EXPLORATION
                                   COMPANY**

                                   **EDGE PETROLEUM OPERATING
                                   COMPANY, INC.**

                                   **EDGE PETROLEUM PRODUCTION
                                   COMPANY**

                                   **MILLER EXPLORATION COMPANY**

                                   **MILLER OIL CORPORATION**

                                   By: _____
                                   Name: _John W. Elias_____
                                   Title: _President & CEO_____

## EXHIBIT B

### List of Taxing Authorities to Which Taxes are Owed

**AD VALOREM TAXING AUTHORITIES:**

ACADIA PARISH, LOUISIANA TAX ASSESSOR-COLLECTOR
BRAZORIA COUNTY TEXAS TAX ASSESSOR-COLLECTOR
BROOKS COUNTY TEXAS ISD
BROOKS COUNTY TEXAS TAX ASSESSOR
COVINGTON CO MS TAX COLLECTOR
DEVERS TEXAS ISD
DEWITT COUNTY TEXAS TAX ASSESSOR-COLLECTOR
DUVAL COUNTY TEXAS TAX ASSESSOR-COLLECTOR
EDDY COUNTY NM TAX ASSESSOR-COLLECTOR
EDINBURG TEXAS CISD
FREER TEXAS ISD
GALENA PARK TEXAS ISD TAX ASSESSOR-COLLECTOR
GOLIAD COUNTY TEXAS APPRAISAL DISTRICT/ISD
GOLIAD COUNTY TEXAS TAX ASSESSOR
GRAY COUNTY TEXAS TAX OFFICE
HAMLIN MI TOWNSHIP TAX OFFICE
HARDIN COUNTY TEXAS TAX ASSESSOR-COLLECTOR
HARRIS COUNTY TEXAS TAX ASSESSOR-COLLECTOR
HIDALGO COUNTY, TEXAS TAX ASSESSOR-COLLECTOR
HILLSDALE MI TAX ASSESSOR-COLLECTOR
JEFFERSON COUNTY TEXAS TAX ASSESSOR-COLLECTOR
JIM HOGG COUNTY TEXAS TAX ASSESSOR-COLLECTOR
JIM HOGG COUNTY ISD
JIM WELLS COUNTY TEXAS APPRAISAL DISTRICT
JIM WELLS COUNTY TEXAS APPRAISAL DISTRICT
JONES COUNTY MISSISSIPPI TAX ASSESSOR-COLLECTOR
KARNES COUNTY TEXAS TAX ASSESSOR COLLECTOR
KENEDY COUNTY TEXAS TAX OFFICE
LAFAYETTE PARISH LOUISIANA TAX-ASSESSOR COLLECTOR
LAMAR CO. MISSISSIPPI TAX COLLECTOR & ASSESSOR
LEA COUNTY, NM TAX ASSESSOR-COLLECTOR
LIBERTY COUNTY TEXAS TAX OFFICE
LIVE OAK COUNTY TEXAS APPRAISAL DISTRICT
MCMULLEN COUNTY TEXAS TAX ASSESSOR-COLLECTOR
NEW MEXICO TAXATION & REVENUE DEPT
NUECES COUNTY TEXAS TAX ASSESSOR-COLLECTOR
OKLAHOMA TAX COMMISSION
READING TOWNSHIP MICHIGAN TREASURER
RIO GRANDE CITY/CISD TEXAS TAX OFFICE
SABINE-NECHES NAVIGATION DISTRICT, TEXAS
SAN PATRICIO COUNTY TEXAS TAX ASSESSOR-COLLECTOR

SHELDON TEXAS ISD - TAX OFFICE
STARR COUNTY, TEXAS TAX ASSESSOR-COLLECTOR
VERMILION PARISH LA TAX OFFICE
VICTORIA COUNTY, TEXAS TAX ASSESSOR
VICTORY TOWNSHIP MICHIGAN TREASURER
WEBB COUNTY TEXAS TAX ASSESSOR-COLLECTOR
WEBB COUNTY TEXAS ISD TAX OFFICE
WHARTON COUNTY TEXAS TAX ASSESSOR-COLLECTOR
WHITE COUNTY ARKANSAS TAX COLLECTOR
ZAPATA COUNTY TEXAS TAX ASSESSOR-COLLECTOR

## FRANCHISE TAXING AUTHORITIES:

ALABAMA DEPARTMENT OF REVENUE
ARKANSAS SECRETARY OF STATE, CORP.
DELAWARE SECRETARY OF STATE
LOUISIANA DEPT REVENUE & TAXATION
MISSISSIPPI STATE TAX COMMISSION
MONTANA DEPARTMENT OF REVENUE
NEW MEXICO TAXATION & REVENUE DEPT
OFFICE OF REVENUE - MISSISSIPPI
TEXAS STATE COMPTROLLER

## SEVERANCE TAXING AUTHORITIES:

ARKANSAS OIL AND GAS COMMISSION
MICHIGAN DEPARTMENT OF TREASURY
MINERALS MANAGEMENT SERVICE
MISSISSIPPI OIL & GAS BOARD
MISSISSIPPI STATE TAX COMMISSION
STATE OF LOUISIANA
STATE OF MICHIGAN
NEW MEXICO TAXATION & REVENUE DEPARTMENT

## PERSONAL PROPERTY TAXING AUTHORITIES:

HARRIS COUNTY TEXAS TAX ASSESSOR-COLLECTOR

## FEDERAL TAXING AGENCIES:

INTERNAL REVENUE SERVICE

## EXHIBIT C

### List of Taxing Authorities to Which Licensing Fees are Owed

ARKANSAS DEPARTMENT OF ENVIRONMENTAL QUALITY
BUREAU OF LAND MANAGEMENT
NEW MEXICO COMMISSIONER OF PUBLIC LANDS
RAILROAD COMMISSION OF TEXAS
TEXAS STATE EMERGENCY RESPONSE COMMISSION
STATE OF LOUISIANA, PERMITTING/LICENSING DEPARTMENT
STATE OF MISSISSIPPI, STATE OIL AND GAS BOARD
BLACKFEET NATION
PERFORMANCE BONDS FOR:
1. MISSISSIPPI
2. NEW MEXICO
3. MONTANA
4. U.S. DEPARTMENT OF INTERIOR

# EXHIBIT D

## UTILITY PROVIDERS

| Utility | Type |
|---|---|
| ALLTEL | Well Phone |
| American Millennium Corp. Inc. | Well Phone |
| AT&T | Well Phone |
| AT&T | Well Phone |
| AT&T | Well Phone |
| AT&T Mobility | Well Phone |
| AT&T Mobility | Well Phone |
| AT&T Mobility | Cell Phone |
| AT&T Mobility | Cell Phone |
| AT&T Mobility | Cell Phone |
| AT&T Mobility | Cell Phone |
| AT&T Mobility | Cell Phone |
| AT&T Mobility | Cell Phone |
| AT&T Mobility | Cell Phone |
| AT&T Mobility | Cell Phone |
| AT&T Mobility | Cell Phone |
| AT&T Mobility | Cell Phone |
| AT&T Mobility | Cell Phone |
| AT&T Mobility | Cell Phone |
| AT&T Mobility | Cell Phone |
| AT&T Mobility | Cell Phone |
| AT&T Mobility | Cell Phone |
| AT&T Mobility | Cell Phone |
| AT&T Mobility | Cell Phone |
| AT&T Mobility | Cell Phone |
| AT&T Mobility | Cell Phone |
| AT&T Mobility | Air Card |
| AT&T Mobility | Air Card |
| AT&T Mobility | Air Card |
| AT&T Mobility | Air Card |
| AT&T Mobility | Air Card |
| AT&T Mobility | Air Card |
| AT&T Mobility | Air Card |
| AT&T Mobility | Air Card |
| AT&T Mobility | Air Card |
| Central Valley Electric Co-op | Electricity |
| Central Valley Electric Co-op | Electricity |
| Central Valley Electric Co-op | Electricity |

| | |
|---|---|
| Central Valley Electric Co-op | Electricity |
| Central Valley Electric Co-op | Electricity |
| Central Valley Electric Co-op | Electricity |
| Central Valley Electric Co-op | Electricity |
| Central Valley Electric Co-op | Electricity |
| Central Valley Electric Co-op | Electricity |
| Central Valley Electric Co-op | Electricity |
| Central Valley Electric Co-op | Electricity |
| Central Valley Electric Co-op | Electricity |
| Central Valley Electric Co-op | Electricity |
| Central Valley Electric Co-op | Electricity |
| Central Valley Electric Co-op | Electricity |
| Central Valley Electric Co-op | Electricity |
| Central Valley Electric Co-op | Electricity |
| Central Valley Electric Co-op | Electricity |
| Central Valley Electric Co-op | Electricity |
| Central Valley Electric Co-op | Electricity |
| Central Valley Electric Co-op | Electricity |
| Consumers Energy ( CMS) | Electricity |
| CPL Retail Energy | Electricity |
| CPL Retail Energy | Electricity |
| CPL Retail Energy | Electricity |
| CPL Retail Energy | Electricity |
| CPL Retail Energy | Electricity |
| Dixie Electrical Power Association | Electricity |
| First Electric Cooperative | Electricity |
| Gecko Inter.net, Inc. | Internet |
| Globalstar | Satellite Phones |
| Hughes Network Systems LLC | Well Phone |
| JCF Communications | Telephone |
| Karnes Electric Cooperative | Electricity |
| Medina Electric Cooperative, Inc. | Electricity |
| Michigan Gas Utilities | Gas |
| Mississippi One-Call System, Inc. | Telephone |
| Mitel Leasing, Inc. | Telephone |
| North Covington Water Assn | Water |
| One Call Systems, Inc. | Email Service |
| Pearl River Valley EPA | Electricity |
| Pure Water Solutions | Water |
| Quality Systems | Well Phone |
| Sam Houston Electric Cooperative | Electricity |

| | |
|---|---|
| Sam Houston Electric Cooperative | Electricity |
| San Patricio Electric Cooperative | Electricity |
| Southern Pine Electric Cooperative | Electricity |
| TW Telecom | Telephone |
| Verizon Wireless | Well Phone |
| West Lamar Water Association | Water |
| West Lamar Water Association | Water |
| Xcel Energy | Electricity |
| Xcel Energy | Electricity |
| Xcel Energy | Electricity |
| Xcel Energy | Electricity |

# EXHIBIT E

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| **In Re:** | § | |
| | § | **Case No. 09-(          )** |
| **EDGE PETROLEUM CORP., et al.,** | § | **Jointly Administered** |
| | § | **Chapter 11** |
| **Debtors.** | § | |

## NOTICE OF FINAL HEARING OF DEBTORS' MOTION
## FOR ENTRY OF INTERIM AND FINAL ORDERS DETERMINING
## ADEQUATE ASSURANCE OF PAYMENT FOR FUTURE UTILITY SERVICES

**Commencement of Chapter 11 Cases**. On _____, (the "Petition Date"), Edge Petroleum Corp. and certain of its affiliates, as debtors and debtors in possession (collectively, the "Debtors") filed voluntary petitions for relief under title 11 of the United States Code (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court").

**Debtors' Adequate Assurance**. On _____, the Debtors filed their Motion for Entry of Interim and Final Orders Determining Adequate Assurance of Payment for Future Utility Services [Docket No.      ] (the "Motion"). On _____, the Bankruptcy Court entered the Interim Order Determining Adequate Assurance of Payment for Future Utility Services [Docket No.      ] (the "Interim Order"). A copy of the Interim Order is attached hereto.

**You are receiving this notice because the Final Order may affect your rights. If you have been identified by the Debtors as a Utility Provider, the information listed for the Utility Providers receiving this notice is listed in the table below.**

**The final hearing (the "Final Hearing") on the relief requested in the Motion shall occur on _____ at _____. Pursuant to the Interim Order, any objections to the Motion must be filed by _____ at _____. Any Utility Provider who fails to file a timely objection to the Motion may be bound by the Proposed Adequate Assurance and the Final Order approving the Motion.**

/s/ _____

Charles R. Gibbs (Texas Bar No. 07846300)
Sarah Link Schultz (Texas Bar No. 24033047)
Yewande Akinwolemiwa (Texas Bar No. 24056633)
AKIN GUMP STRAUSS HAUER & FELD LLP

1700 Pacific Avenue, Suite 4100
Dallas, Texas  75201
Telephone: 214.969.2800
Facsimile: 214.969.4343

-and-

Shelby A. Jordan (Texas Bar No. 11016700)
Nathaniel Peter Holzer (Texas Bar No. 00793971)
Harlin C. Womble (Texas Bar No. 21880300)
JORDAN, HYDEN, WOMBLE, CULBRETH &
HOLZER, P.C.
500 North Shoreline Boulevard, Suite 900
Corpus Christi, Texas  78471
Telephone: 361.884.5678
Facsimile: 361.888.5555

*Proposed Attorneys for the Debtors and Debtors in
Possession*

## UTILITY PROVIDERS

| Utility | Type |
|---|---|
| ALLTEL | Well Phone |
| American Millennium Corp. Inc. | Well Phone |
| AT&T | Well Phone |
| AT&T | Well Phone |
| AT&T | Well Phone |
| AT&T Mobility | Well Phone |
| AT&T Mobility | Well Phone |
| AT&T Mobility | Cell Phone |
| AT&T Mobility | Cell Phone |
| AT&T Mobility | Cell Phone |
| AT&T Mobility | Cell Phone |
| AT&T Mobility | Cell Phone |
| AT&T Mobility | Cell Phone |
| AT&T Mobility | Cell Phone |
| AT&T Mobility | Cell Phone |
| AT&T Mobility | Cell Phone |
| AT&T Mobility | Cell Phone |
| AT&T Mobility | Cell Phone |
| AT&T Mobility | Cell Phone |
| AT&T Mobility | Cell Phone |
| AT&T Mobility | Cell Phone |
| AT&T Mobility | Cell Phone |
| AT&T Mobility | Cell Phone |
| AT&T Mobility | Cell Phone |
| AT&T Mobility | Cell Phone |
| AT&T Mobility | Cell Phone |
| AT&T Mobility | Air Card |
| AT&T Mobility | Air Card |
| AT&T Mobility | Air Card |
| AT&T Mobility | Air Card |
| AT&T Mobility | Air Card |
| AT&T Mobility | Air Card |
| AT&T Mobility | Air Card |
| AT&T Mobility | Air Card |
| AT&T Mobility | Air Card |
| Central Valley Electric Co-op | Electricity |
| Central Valley Electric Co-op | Electricity |
| Central Valley Electric Co-op | Electricity |

| | |
|---|---|
| Central Valley Electric Co-op | Electricity |
| Central Valley Electric Co-op | Electricity |
| Central Valley Electric Co-op | Electricity |
| Central Valley Electric Co-op | Electricity |
| Central Valley Electric Co-op | Electricity |
| Central Valley Electric Co-op | Electricity |
| Central Valley Electric Co-op | Electricity |
| Central Valley Electric Co-op | Electricity |
| Central Valley Electric Co-op | Electricity |
| Central Valley Electric Co-op | Electricity |
| Central Valley Electric Co-op | Electricity |
| Central Valley Electric Co-op | Electricity |
| Central Valley Electric Co-op | Electricity |
| Central Valley Electric Co-op | Electricity |
| Central Valley Electric Co-op | Electricity |
| Central Valley Electric Co-op | Electricity |
| Central Valley Electric Co-op | Electricity |
| Central Valley Electric Co-op | Electricity |
| Consumers Energy ( CMS) | Electricity |
| CPL Retail Energy | Electricity |
| CPL Retail Energy | Electricity |
| CPL Retail Energy | Electricity |
| CPL Retail Energy | Electricity |
| CPL Retail Energy | Electricity |
| Dixie Electrical Power Association | Electricity |
| First Electric Cooperative | Electricity |
| Gecko Inter.net, Inc. | Internet |
| Globalstar | Satellite Phones |
| Hughes Network Systems LLC | Well Phone |
| JCF Communications | Telephone |
| Karnes Electric Cooperative | Electricity |
| Medina Electric Cooperative, Inc. | Electricity |
| Michigan Gas Utilities | Gas |
| Mississippi One-Call System, Inc. | Telephone |
| Mitel Leasing, Inc. | Telephone |
| North Covington Water Assn | Water |
| One Call Systems, Inc. | Email Service |
| Pearl River Valley EPA | Electricity |
| Pure Water Solutions | Water |
| Quality Systems | Well Phone |
| Sam Houston Electric Cooperative | Electricity |

| Sam Houston Electric Cooperative | Electricity |
|---|---|
| San Patricio Electric Cooperative | Electricity |
| Southern Pine Electric Cooperative | Electricity |
| TW Telecom | Telephone |
| Verizon Wireless | Well Phone |
| West Lamar Water Association | Water |
| West Lamar Water Association | Water |
| Xcel Energy | Electricity |
| Xcel Energy | Electricity |
| Xcel Energy | Electricity |
| Xcel Energy | Electricity |

# EXHIBIT F

_____, 2009

TO:   [Vendor]

Dear Valued Vendor:

      On _____, 2009 (the "Petition Date"), Edge Petroleum Corporation and certain of its affiliates (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court"). The Debtors have requested authority to pay certain vendors in recognition of the critical nature of their relationship with such vendors. On _____, the Bankruptcy Court entered an order (the "Order") authorizing the Debtors, under certain conditions, to pay a portion of the pre-bankruptcy claims of critical vendors that: (i) agree to the terms set forth below; and (ii) agree to be bound by the terms of the Order. A copy of the Order is enclosed.

      In order to receive payment on pre-bankruptcy claims, each trade vendor must agree to continue to supply goods to the Debtors based on the "Customary Trade Terms." Customary Trade Terms are defined as: (i) the normal and customary trade terms, practices and programs (including credit limits, pricing, cash discounts, timing of payments, and allowances) which were most favorable to the Debtors and in effect between such vendor and the Debtors on a historical basis within 180 days of the Petition Date; (ii) such other trade terms, practices or programs that are at least as favorable to the Debtors as those that were in effect before the Petition Date; or (iii) such other trade terms that would be common in the industry and are acceptable to the Debtors in their business judgment.

      For purposes of administration of this vendor payment program as authorized by the Bankruptcy Court (the "Vendor Payment Program"), the Debtors and you agree as follows:

1.    The estimated balance of the pre-bankruptcy trade claim (net of any setoffs, credits or discounts) (the "Critical Vendor Claim") is $[  ].

2.    The Debtors will provisionally pay you $[   ] of your Critical Vendor Claim on [    ] and this payment will be applied to your most recent invoices. The Debtors will continue to pay you your Critical Vendor Claim as follows: _____

_____

3.    You will provide open credit terms as follows (if more space is required, attach continuation pages) (the "Trade Terms"): _____

_____

_____

4.    The open trade balance or credit line that you will extend to the Debtors for shipment of goods after the Petition Date is $_____ (which shall not be

less than the greater of the open trade balance outstanding: (i) on the Petition Date; or (ii) on normal and customary terms on a historical basis for the period 180 days before and up to the Petition Date). You agree to use commercially reasonable steps to fully service the Debtors as requested pursuant to the terms set forth herein.

5.      In consideration for payment of a portion of your Critical Vendor Claim, you agree not to file or otherwise assert against the Debtors, their assets or any other person or entity (or any of their respective assets or property whether real or personal), any lien (regardless of the statute or other legal authority upon which such lien is asserted) related in any way to any remaining pre-bankruptcy amounts allegedly owed to you by the Debtors arising from agreements entered into prior to the Petition Date. Furthermore, if you have taken steps to file or assert such a lien prior to entering into this letter agreement, you agree to take the necessary steps to remove such lien as soon as possible.

6.      You agree not to terminate any contract with the Debtors pursuant to Bankruptcy Code sections 556, 560 or 561.

7.      You agree that you shall not require a lump sum payment upon confirmation of a plan in these chapter 11 cases on account of any administrative expense priority claim that you may assert, but instead agree that such claims will be paid in the ordinary course of business after confirmation of a plan under applicable Customary Trade Terms, if the plan provides for the ongoing operations of the Debtors.

8.      You will hereafter extend to the Debtors all Customary Trade Terms.

Payment of your Critical Vendor Claim in the manner set forth in the Order may only occur upon execution of this letter by a duly authorized representative of your company and the return of this letter to the Debtors.  Your execution of this letter and return of the same to the Debtors constitutes an agreement by you and the Debtors:

1.      to the Customary Trade Terms and, subject to the reservations contained in the Order, to the amount of the Critical Vendor Claim set forth above;

2.      that, for a period of no less than one year from the Petition Date, you will continue to supply the Debtors with goods pursuant to the Customary Trade Terms, and that the Debtors will pay for such goods in accordance with the Customary Trade Terms;

3.      that you have reviewed the terms and provisions of the Order and that you consent to be bound by such terms;

4.      that you will not separately seek payment for reclamation and similar claims outside the terms of the Order unless this Vendor Agreement is terminated; and

5.      that, if the Vendor Agreement terminates, or you later refuse to continue to supply goods to the Debtors on Customary Trade Terms, any payments received by you on account of your Critical Vendor Claim will be deemed to have been in payment of then outstanding post-petition obligations owed to you and that you will immediately repay to the Debtors any payments made to you on account of your Critical Vendor Claim to the extent that the aggregate amount of such payment exceeds the post-petition obligations then outstanding without the right of any setoffs, claims, provision for payment of reclamation or trust fund claims, or otherwise.

The Debtors and you also hereby agree that any dispute with respect to this Vendor Agreement, the Order and/or your receipt of payments for your Critical Vendor Claim shall be determined by the Bankruptcy Court.

If you have any questions about this Agreement or our financial restructuring, do not hesitate to call [_____] at [_____].

Sincerely,

[Applicable Debtor]

By: _____

Title: _____

Date: _____

Agreed and Accepted by:

[Name of Vendor]

By: _____

Title: _____

Dated: _____

# EXHIBIT G

**Disbursement Accounts**

| Entity | Bank | Account No. |
|---|---|---|
| G&A Payables | Compass Bank<br>24 Greenway Plaza<br>14th Floor<br>Houston, TX  77046 | xxxx8087 |
| EPOC Payables | Compass Bank<br>24 Greenway Plaza<br>14th Floor<br>Houston, TX  77046 | xxxx8060 |
| EPOC Revenue Account | Compass Bank<br>24 Greenway Plaza<br>14th Floor<br>Houston, TX  77046 | xxxx8079 |
| EPE Payroll Account | Compass Bank<br>24 Greenway Plaza<br>14th Floor<br>Houston, TX  77046 | xxxx7659 |

# EXHIBIT H

# BANK ACCOUNTS

## Edge Petroleum Corporation and Subsidiaries
### Bank Accounts

| Account Name | Bank | Account No. | Description/Use | Estimated Balance |
|---|---|---|---|---|
| Edge Petroleum Operating Co., Inc. | Compass Bank 24 Greenway Plaza 14th Floor Houston, TX 77046 | xxxx1904 | Operating Account – (Lockbox Deposits, Wires) | $15,655,202.56 |
| EPOC Draft Account | Compass Bank 24 Greenway Plaza 14th Floor Houston, TX 77046 | xxxx1602 | Land Drafts – ZBA | - |
| EPE Payroll Account | Compass Bank 24 Greenway Plaza 14th Floor Houston, TX 77046 | xxxx7659 | Payroll – ZBA | - |
| EPE G&A | Compass Bank 24 Greenway Plaza 14th Floor Houston, TX 77046 | xxxx8087 | G&A Payables – ZBA (checking) | ($135,868.64) |
| Miller Oil Company | Compass Bank 24 Greenway Plaza 14th Floor Houston, TX 77046 | xxxx6939 | Miller Deposits – ZBA | - |
| EPOC Revenue Account | Compass Bank 24 Greenway Plaza 14th Floor Houston, TX 77046 | xxxx8079 | Revenue Payables – ZBA (checking) | ($1,818,177.63) |
| EPOC Payables | Compass Bank 24 Greenway Plaza 14th Floor Houston, TX 77046 | xxxx8060 | Operating Payables – ZBA (checking) | ($296,128.95) |
| Edge Petroleum Production Company | Compass Bank 24 Greenway Plaza 14th Floor Houston, TX 77046 | xxxx8744 | Cinco/EPPC Deposits – ZBA | - |

044232.0004 WEST 6330273 v8

# EXHIBIT I

EDGE PETROLEUM CORPORATION
OVERALL CASH MANAGEMENT SYSTEM - FLOW OF CASH



# EXHIBIT J

.

EDGE PETROLE...., CORPORATION
OVERALL CASH MANAGEMENT SYSTEM - FLOW OF CASH