IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| **In Re:** | § § | **Case No. 09-20644** |
| **EDGE PETROLEUM CORP., et al.,** | § § | **Jointly Administered** |
| | § | **Chapter 11** |
| Debtors. | § | |

## DEBTORS' MOTION FOR AN ORDER AUTHORIZING THE DEBTORS TO ADOPT AND IMPLEMENT INCENTIVE PLANS FOR EMPLOYEES

COME NOW the above-captioned debtors and debtors in possession (the "Debtors") and file this Debtors' Motion for an Order Authorizing the Debtors to Adopt and Implement Incentive Plans for Employees (the "Motion"). In support of this Motion, the Debtors state as follows:

### I. JURISDICTION AND VENUE

1. This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

2. The statutory predicates for the relief sought herein are sections 105 and 363 of title 11 of the United States Code (the "Bankruptcy Code").

### II. BACKGROUND

A. **The Debtors' Businesses**

3. On October 1, 2009 (the "Petition Date"), Edge Petroleum Corporation, a Delaware corporation ("Edge"), as well as various Edge subsidiaries, filed petitions pursuant to chapter 11 of the Bankruptcy Code with this Court. The Debtors continue to operate their businesses pursuant to Bankruptcy Code sections 1107(a) and 1108.

044232.0004 WEST 6383831 v8

4. The Debtors are independent energy companies engaged in the exploration, development, acquisition and production of natural gas, natural gas liquids and crude oil. The Debtors' operations are focused onshore in the United States, primarily in south and southeast Texas, southeast New Mexico, Mississippi, Arkansas and Louisiana. As of December 31, 2008, 83% of the Debtors' proved reserves were in Texas, 6% were in Mississippi, 6% were in New Mexico and 5% were in south Louisiana, Michigan, Alabama and Arkansas, collectively.

5. As of June 30, 2009, the Debtors reported total assets of approximately $264 million on their unaudited balance sheets, of which $43.2 million were current assets. The remaining $220.8 million in reported assets related primarily to property costs. The Debtors reported a consolidated net loss of approximately $9.4 million for the three months ending June 30, 2009 and a consolidated net loss of approximately $86.3 million for the six months ending June 30, 2009.

**B.     The Debtors' Proposed Plan of Reorganization and Related Agreements**

6. In January 2007, the Debtors entered into a credit agreement (the "Credit Facility") with Union Bank of California as agent and issuing lender (the "Bank Agent") and other lenders party thereto (collectively and together with the Bank Agent, the "Pre-petition Lenders"). Faced with declining revenues and the need to address the near-term maturity of the Credit Facility and following an extensive pre-petition marketing effort, prior to the Petition Date, the Debtors engaged in discussions with the Pre-petition Lenders regarding a potential restructuring plan for the Debtors. After several weeks of active and arm's-length negotiations, the Debtors reached an agreement with a majority of the Pre-petition Lenders regarding the terms of a pre-arranged restructuring plan (the "Plan"), as evidenced by a certain Plan Support Agreement (the "Plan Support Agreement"). The Debtors' Plan and the Plan Support Agreement were filed by the Debtors on the Petition Date. The Debtors believe that the agreements reached

with a majority of the Pre-petition Lenders and evidenced by the Plan and the Plan Support Agreement will significantly facilitate these chapter 11 cases and the Debtors' objective of preserving and enhancing value for the benefit of their stakeholders.

C.  **The Proposed Sale of Edge's Subsidiaries to PGP**

7.  On the Petition Date, the Debtors also sought Court approval of their proposed bidding procedures to effect the sale of substantially all of their assets (the "Sale Motion") to the third party who submits the highest and best offer to purchase and acquire the stock (the "Equity Interests") of Edge's subsidiaries.[1] In connection with the Sale Motion, on September 30, 2009, the Debtors and PGP Gas Supply Pool No. 3 LLC ("PGP") entered into a purchase and sale agreement (the "Purchase Agreement") whereby PGP would purchase the Equity Interests for a base purchase price of $191 million, subject to adjustment as provided in the Purchase Agreement and also subject to higher and better offers.

8.  In connection with the Purchase Agreement, PGP has the option to employ some or all of the Debtors' employees (the "Employees"). To that end, the Debtors understand that PGP has identified a number of Employees it wishes to employ if PGP submits the highest and best bid for the Equity Interests.

9.  Further, the Debtors believe it likely that other potential purchasers may wish to employ substantially all of the Debtors' current Employees. To the extent such Employees are not employed by the Debtors at the time of the sale, such bidders may submit a materially lower bid for the Debtors' assets.

---

[1] The Purchase Agreement contemplates the sale of the stock of the following entities: Edge Petroleum Exploration Company, Edge Petroleum Operating Company, Edge Petroleum Production Company, Miller Exploration Company, and Miller Oil Corporation.

D.  **The Debtors' Pre-petition Employee Programs**

10. In late 2008, the Debtors implemented an Employee retention plan (the "Retention Plan") for all or substantially all of their Employees.[2] At the time the Retention Plan was implemented, the Debtors were experiencing significant attrition of Employees. The Retention Plan was considered and approved by Edge's board of directors.

11. Additionally, historically the Debtors always had change of control/severance agreements with all of their Employees (the "Severance Agreements"). The Severance Agreements provide for a lump-sum, cash payment if, upon the occurrence of a change of control event, an Employee is not employed by the acquiring party. Typically, payments under the Severance Agreements for non-insiders were the higher of (a) a multiple of years of service plus their target bonus or (b) a multiple of base salary plus their target bonus. Payments under the Severance Agreements for insiders were typically a blend of a multiple of base salary plus their target bonus.

E.  **The Debtors' Proposed Post-petition Employee Programs**

12. The Debtors are cognizant of the restrictions on payments to Employees imposed by recent amendments to the Bankruptcy Code. The Debtors also believe, however, that their Employees are critical to the successful completion of the sale process contemplated by their chapter 11 filings. Specifically, as noted above, if the Purchase Agreement is ultimately selected as the highest and best offer for the Equity Interests, it is anticipated that PGP will employ some of the Debtors' Employees. Furthermore, the Debtors believe that other potential purchasers may wish to employ some or all of the Debtors' Employees if they are the successful bidder. As such, an important element of a successful sale process is the continued employment of the

Debtors' current Employees who have, among other things, valuable historical knowledge regarding the Debtors' operations.

13. To incentivize current Employees continue to work towards the closing of a sale of substantially all of the Debtors' assets, the Debtors propose to implement the following post-petition Employee incentive plans (collectively, the "Incentive Plans"):

- Each of the Debtors' Employees who continue to be employed by the Debtors on the effective date of the Debtors' plan of reorganization (the "Effective Date")[3] will be entitled to receive an incentive bonus[4] for assisting in the successful closing of the sale.

- To the extent that an Employee is not employed by the Debtors on the Effective Date, the Debtors may, after consultation with the United States Trustee for the Southern District of Texas (the "U.S. Trustee"), the Bank Agent and any official committee that may be appointed in these cases, reallocate such funds among the Employees.

- To the extent an Employee will not be employed by the successful bidder in a capacity and with a level of compensation and responsibility that is greater than or equal to that of his or her current employment, such Employee will be entitled to collect a severance payment (each, a "Severance Payment"), which payment will be a function of the payment such Employee would have been entitled to received under the pre-petition Severance Agreements.

- To the extent that an Employee will be employed in a capacity and with a level of compensation and responsibility that is greater than or equal to that of his or her current employment, such Employee's Severance Payment may be reallocated by the Debtors, after consultation with the U.S. Trustee, the Bank Agent and any official committee that may be appointed in this case, among the Employees.

- The aggregate cost of the Incentive Plans shall not exceed $1.8 million.

---

[2] Twenty-five (25) current non-insider Employees participate in the current Retention Plan, with retention bonuses ranging from $5,000 to $50,000.

[3] Pursuant to the Plan, the Effective Date is to occur simultaneously with the closing of the sale of the Equity Interests, or such other sale of substantially all of the Debtors' assets pursuant to a higher and better offer.

[4] Any such incentive payment will also take into account payments made to Employees pre-petition to encourage such Employees to remain with the Debtors.

14. Attached hereto as **Exhibit A** is a list of the proposed payments to be made to the Debtors' Employees pursuant to the Incentive Plans.[5] Payments made under the Incentive Plans would be in complete satisfaction of and in lieu of any severance, incentive, change of control, or other payments that an Employee may otherwise allegedly be due and owing under the pre-petition Retention Plan and/or the Severance Agreements.

15. The Debtors have discussed the proposed Incentive Plans extensively with the Bank Agent. The Bank Agent agrees that the Incentive Plans are important to ensure that the Employees remain with the Debtors during the sale process and, accordingly, to ensure that the value of the Debtors' assets is maximized, the Bank Agent has agreed to allow up to $1.8 million to be used to fund the Incentive Plans.[6] Absent such agreement, these funds would inure to the benefit of the Pre-petition Lenders.[7]

### III. RELIEF REQUESTED

16. By this Motion, the Debtors seek authorization pursuant to Bankruptcy Code sections 105(a) and 363(b) to implement the Incentive Plans for the Debtors' Employees, who are key to the successful closing of the proposed sale of the Debtors' assets.

---

[5] Contemporaneous with the filing of this Motion, the Debtors have sought authority to file **Exhibit A** to this Motion under seal.

[6] Certain of the Debtors' Employees are prohibited from participating in the proposed Incentive Plans unless and until they agree to waive any administrative claims against the Debtors' estates for amounts that would otherwise be payable pursuant to the proposed Incentive Plans in the event that the Bank Agent withdraws its support. These Employees include John Elias, John Tugwell, Gary Pittman, Howard Creasey, Robert Thomas, Kirsten Hink, and Richard Parma.

[7] It is important to note that because the Debtors' proposed plan provides for a pot of cash to be available to fund administrative expense claims, priority claims, and general unsecured claims, granting the Motion will in no way impact the recovery available to the Debtors' unsecured creditors.

A.  **Implementation of the Incentive Plans is a Valid Exercise of the Debtors' Business Judgment**

17. Bankruptcy Code section 363(b)(1) provides, in pertinent part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate . . . ." 11 U.S.C. § 363(b)(1). *See, e.g., In re Cont'l Air Lines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986); *In re Eagle Broadband, Inc.*, 2009 WL 1067128, at *1 (Bankr. S.D. Tex. Apr. 9, 2009); *In re Quality Beverage Co., Inc.*, 181 B.R. 887, 895 (Bankr. S.D. Tex. 1995). Although section 363 does not set forth a standard for determining when it is appropriate for a court to authorize the use, sale, or lease of estate property outside the ordinary course of business, applicable case law provides that a bankruptcy court should approve a transaction that is outside the ordinary course of a debtor's business if the debtor can demonstrate that it exercised sound business judgment in deciding to enter into the transaction. *In re Cont'l Air Lines*, 780 F.2d at 1226. *See also In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983); *In re Bombay Co., Inc.*, 2007 WL 2826071, at *4 (Bankr. N.D. Tex. Sept. 26, 2007) (stating that the court should "rely heavily on the business judgment of a debtor's management in determining whether to grant relief respecting the use, sale or lease of estate property"); *In re Oaktree Imaging, L.P.*, 2007 WL 2667979, at *2 (Bankr. S.D. Tex. Sept. 6, 2007) (noting that the "[debtor's] decision should be approved, where a sound business purpose justifies such action").

18. If the debtor articulates a valid business justification, there "is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)). Once a valid business judgment is made, the business judgment rule shields a debtor's management from judicial second-guessing. *Richmond Leasing Co. v. Capital*

*Bank, N.A.*, 762 F.2d 1303, 1309 (5th Cir. 1985) (stating that court approval of a debtor's business judgment "should only be withheld if the debtor's judgment is clearly erroneous, too speculative, or contrary to the provisions of the Bankruptcy Code").

19. In the case at hand, the Debtors have exercised their sound business judgment in evaluating their need to incentivize their current Employees to remain with the Debtors through the sale process. Implementing the proposed Incentive Plans is necessary for the Debtors to ensure that the Debtors' current Employees, who are a valuable asset of the Debtors' business and the most qualified individuals to complete the proposed sale of the Debtors' assets, are available to assist in completing the proposed sale of the Equity Interests.

20. Moreover, Bankruptcy Code section 105(a) gives this Court broad authority under its equitable powers to fashion any order or decree that would preserve or protect the value of a debtor's assets. *In re Davis*, 730 F.2d 176, 183-84 (5th Cir. 1984) (stating that "bankruptcy courts [are armed] with broad powers . . . to protect the estate"). *See also Perkins Coie v. Sadkin (In re Sadkin)*, 36 F.3d 473, 478 (5th Cir. 1994) (stating that section 105(a) authorizes bankruptcy courts to "fashion such orders as are necessary to further the . . . substantive provisions of the Bankruptcy Code"); *U.S. v. Sutton*, 786 F.2d 1305, 1307 (5th Cir. 1986) (same).

21. The decision to implement the Incentive Plans falls well within the Debtors' sound business judgment. First and foremost, because the Incentive Plans will be funded with monies from the Pre-petition Lenders' recovery, they are essentially a gift from the Pre-petition Lenders to the Employees. Further, the Debtors' Employees are now tasked with providing their highest level of services at a time when they know that their employment with the Debtors may only be for a limited duration and that the ability to secure future employment is limited both by

the purchaser's decision not to retain them and by the time commitment necessary to helping the Debtors maximize the value of its assets for the benefit of all. Similarly, the proposed sale of the Debtors' assets can only be accomplished through the hard work and dedication of the Employees.

22. In like circumstances, bankruptcy courts have found that a debtor's use of reasonable performance bonuses and other incentives for employees is a valid exercise of a debtor's business judgment. *See, e.g., In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153-55 (D. Del. 1999) (affirming bankruptcy court decision that a sound business purpose justified payment under debtors' employee incentive programs); *In re Asarco, LLC*, Case No. 05-21207 (Bankr. S.D. Tex. Apr. 6, 2006) (approving employee incentive program as within debtor's sound business judgment).[8]

### B. The Incentive Plans and Severance Payments are Consistent With Bankruptcy Code Section 503(c) With Respect to the Debtors' Non-insider Employees

23. In addition to constituting a valid exercise of the Debtors' business judgment, the implementation of the Incentive Plans and the payment of the proposed Severance Payments with respect to the Debtors' non-insider Employees complies with both the letter and the spirit of Bankruptcy Code section 503(c). With respect to the Debtors' non-insider Employees, the Severance Payments do not implicate section 503(c)(1) nor section 503(c)(2) because none of the Debtors' non-insider Employees are "insiders" as such term is defined in Bankruptcy Code section 101(31).[9] Providing such benefits to the Debtors' non-insider Employees will assist the

---

[8] *See also In re Am. W. Airlines, Inc.*, 171 B.R. 674, 678 (Bankr. D. Ariz. 1994) (approving the award of "success bonuses" to certain officers and employees as within a debtor's sound business judgment); *In re Interco, Inc.*, 128 B.R. 229, 234 (Bankr. E.D. Mo. 1991) (stating that a debtor's business judgment was controlling in the approval of a "performance / retention program").

[9] If the debtor is a corporation, the Bankruptcy Code defines the term "insider" to include any "(i) director of the debtor; (ii) officer of the debtor; (iii) person in control of the debtor; (iv) partnership in which the debtor is a general

Debtors in retaining the necessary services of the non-insider Employees throughout the course of the Debtors' cases. Further, to the extent that section 503(c)(3) is found to apply, the implementation of the proposed Incentive Plans and the payment of the proposed Severance Payments is justified by the facts and circumstances of the Debtors' cases, and therefore meets the standard of section 503(c)(3).

C. **The Proposed Incentive Plans are Consistent With Bankruptcy Code Section 503(c) With Respect to the Employees**

24. Section 503(c)(1) is not applicable to the proposed Incentive Plans. To the extent that the Incentive Plans propose to make payments to the Employees, who likely qualify as "insiders" pursuant to Bankruptcy Code section 101(31), those awards are not "retention" payments that are restricted under section 503(c)(1) because they are not provided "for the purpose of inducing [the insiders] to remain" with the Debtors' business. Rather, the Incentive Plans are intended to create incentives for the Employees to reach a performance goal – namely, the successful sale of substantially all of the Debtors' assets. Indeed, the Incentive Plans are not intended to "induce" anyone to "remain with the debtor's business," in a manner different than any other component of their compensation. *In re Global Home Prods., LLC*, 369 B.R. 778, 787 (Bankr. D. Del. 2007) (finding that debtor was seeking approval of "incentive, not retention plans and, therefore, section 503(c) does not come into play"); *In re Nellson Nutraceutical, Inc.*, 369 B.R. 787, 802 (Bankr. D. Del. 2007) (finding that even though the bonus program had "some retentive effect, it is for the primary purpose of motivating employees and, thus, the limitations of section 503(c)(1) are not applicable"); *In re Dana Corp.*, 358 B.R. 567, 575 (Bankr. S.D.N.Y. 2006) ("section 503(c) was not intended to foreclose a chapter 11 debtor from *reasonably*

---

partner; (v) general partner of the debtor; or (vi) relative of a general partner, director, officer, or person in control of the debtor." 11 U.S.C. § 101(31)(B).

compensating employees, including 'insiders,' for their contribution" to the debtor's chapter 11 case).

25. Further, the proposed Severance Payments to the Debtors' Employees are consistent with Bankruptcy Code section 503(c)(2). Specifically, the Severance Payments to be made pursuant to the proposed Incentive Plans are part of a program generally applicable to all full-time Employees of the Debtors and are not greater than ten (10) times the amount of mean severance pay given to the Debtors' non-insider Employees during the calendar year in which the Severance Payments are to be made.

26. Section 503(c)(3) governs the implementation of the proposed Incentive Plans. The payments proposed by the Incentive Plans, certain of which may be characterized as outside of the ordinary course, are justified by the facts and circumstances in this case, and therefore meet the standard of Bankruptcy Code section 503(c)(3). Employee morale, focus, and performance, much of which may have been adversely impacted by the Debtors' chapter 11 filings, are critical to the success of the proposed sale of the Debtors' assets. Human capital is one of the Debtors' most valuable resources, and the importance of preserving and enhancing the value of this resource cannot be overstated. Further, because payments to the Employees pursuant to the proposed Incentive Plans are conditioned upon the successful sale of all of the Debtors' assets, the risk to be borne by the Employees in this regard is substantial, and the achievement of this target is uncertain and not to be regarded as a simple "lay-up" for the Employees. *See In re Dana Corp.*, 358 B.R. 567, 581-83 (Bankr. S.D.N.Y. 2006) (approving incentive plan when benchmarks were "uncertain, at best" and "clearly not 'lay-ups'").

27. Based on the foregoing, the Debtors believe that implementation of the proposed Incentive Plans is critical to maximize the going concern value of the Debtors' assets.

Accordingly, the Debtors submit that the decision to implement the Incentive Plans is well within the Debtors' sound business judgment and the relief requested herein should be granted.

## IV. NOTICE

28. No trustee, examiner, or statutory creditors' committee has been appointed in these chapter 11 cases. Notice of this Motion has been provided to: (i) the U.S. Trustee; (ii) the Debtors' 30 largest unsecured creditors (on a consolidated basis); (iii) the Bank Agent; (iv) the Securities and Exchange Commission; (v) the Office of the United States Attorney for the Southern District of Texas; (vi) the Internal Revenue Service; (vii) persons who have filed a request for notice pursuant to Bankruptcy Rule 2002, and such other government agencies to the extent required by the Bankruptcy Rules and Bankruptcy Local Rules. The Debtors submit that no other or further notice need be provided.

## V. NO PREVIOUS REQUEST

29. No previous request for the relief sought herein has been made to this or any other Court.

## VI. CONCLUSION

WHEREFORE, the Debtors respectfully request that this Court enter an order, substantially in the form attached hereto as **Exhibit B**, (a) authorizing the Debtors to implement the Incentive Plans for the Debtors' Employees; and (b) granting such other and further relief as is just and proper.

Dated: November 24, 2009

    Respectfully submitted,

    **AKIN GUMP STRAUSS HAUER & FELD LLP**

    By: /s/ *Sarah Link Schultz*
    Charles R. Gibbs (SBN 07846300; Fed ID 177)
    Sarah Link Schultz (SBN 24033047; Fed ID 30555)
    Yewande Akinwolemiwa (SBN 24056633; Fed ID 909757)
    1700 Pacific Avenue, Suite 4100
    Dallas, Texas 75201
    Telephone: 214.969.2800
    Facsimile: 214.969.4343

    -and-

    Shelby A. Jordan (SBN 11016700; Fed ID 2195)
    Nathaniel Peter Holzer (SBN 00793971; Fed ID 21503)
    Harlin C. Womble (SBN 21880300; Fed. ID 8959)
    **JORDAN, HYDEN, WOMBLE, CULBRETH & HOLZER, P.C.**
    500 North Shoreline Boulevard, Suite 900
    Corpus Christi, Texas 78471
    Telephone: 361.884.5678
    Facsimile: 361.888.5555

    **ATTORNEYS FOR EDGE PETROLEUM CORPORATION, ET AL.**

# EXHIBIT A

## Proposed Incentive Payments to Employees

## (Redacted)

# EXHIBIT B

## Proposed Order

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| **In Re:** | § | |
| | § | **Case No. 09-20644** |
| **EDGE PETROLEUM CORP., et al.,** | § | **Jointly Administered** |
| | § | **Chapter 11** |
| **Debtors.** | § | |

ORDER AUTHORIZING THE DEBTORS TO ADOPT AND
IMPLEMENT INCENTIVE PLANS FOR EMPLOYEES
(Docket No. ___)

Upon the Debtors' Motion for an Order Authorizing the Debtors to Adopt and Implement Incentive Plans for Employees (the "Motion") filed by the above-captioned debtors and debtors in possession (the "Debtors"), and the Bank Agent having agreed that the Incentive Plans are important to ensure that the Employees remain with the Debtors during the sale process and agreeing that up to $1.8 million may be used to fund the Incentive Plans, and the Court having jurisdiction to consider the Motion, having heard the evidence and statements of counsel regarding the Motion, and finding that no further notice is needed, it is therefore

**ORDERED**, that the Motion is GRANTED; and it is further

**ORDERED**, all capitalized terms not defined herein shall have the meaning given to them in the Motion; and it is further

**ORDERED**, that the Debtors are authorized to implement the following Incentive Plans:

- Each of the Debtors' Employees[1] who continue to be employed by the Debtors on the effective date of the Debtors' plan of reorganization (the

---

[1] Certain of the Debtors' Employees are prohibited from participating in the proposed Incentive Plans unless and until they agree to waive any administrative claims against the Debtors' estates for amounts that would otherwise be payable pursuant to the proposed Incentive Plans in the event that the Bank Agent withdraws its support. These Employees include John Elias, John Tugwell, Gary Pittman, Howard Creasey, Robert Thomas, Kirsten Hink, and Richard Parma.

- "Effective Date")[2] will be entitled to receive an incentive bonus[3] for assisting in the successful closing of the sale.

- To the extent that an Employee is not employed by the Debtors on the Effective Date, the Debtors may, after consultation with the United States Trustee for the Southern District of Texas (the "U.S. Trustee"), the Bank Agent and any official committee that may be appointed in these cases, reallocate such funds among the Employees.

- To the extent an Employee will not be employed by the successful bidder in a capacity and with a level of compensation and responsibility that is greater than or equal to that of his or her current employment, such Employee will be entitled to collect a severance payment (each, a "Severance Payment"), which payment will be a function of the payment such Employee would have been entitled to received under the pre-petition Severance Agreements.

- To the extent that an Employee will be employed in a capacity and with a level of compensation and responsibility that is greater than or equal to that of his or her current employment, such Employee's Severance Payment may be allocated by the Debtors, after consultation with the U.S. Trustee, the Bank Agent and any official committee that may be appointed in this case, among the Employees.

- The aggregate cost of the Incentive Plans shall not exceed $1.8 million;

and it is further

**ORDERED**, that payments made under the Incentive Plans are in complete satisfaction of and in lieu of any severance, incentive, change of control, or other payments that an Employee may otherwise allegedly be due and owing under the pre-petition Retention Plan and/or the Severance Agreements; and it is further

---

[2] Pursuant to the Plan, the Effective Date is to occur simultaneously with the closing of the sale of the Equity Interests, or such other sale of substantially all of the Debtors' assets pursuant to a higher and better offer.

[3] Any such incentive payment will also take into account payments made to Employees pre-petition to encourage such Employees to remain with the Debtors.

**ORDERED**, that the Debtors, their officers, employees and agents, are authorized to take or refrain from taking such acts as are necessary and appropriate to implement and effectuate the relief granted herein; and it is further

**ORDERED**, that this Court shall retain jurisdiction over all matters arising from or related to the interpretation and implementation of this Order.

DATED: _____, 2009.

_____
**UNITED STATES BANKRUPTCY JUDGE**